**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| **BURL I. NEWTON and SHARON C.** | : | |
| **NEWTON** | : | |
| **Plaintiffs** | : | |
| | | |
| **VERSUS** | : | **CIVIL ACTION NO. 3:11-cv-493** |
| | | |
| **BANK OF MCKENNEY and** | : | |
| **WILLIAM D. ALLEN, III** | : | |
| **Defendants** | : | |

**MEMORANDUM IN OPPOSITION BY PLAINTIFFS AND COUNTER-CLAIM**
**DEFENDANTS, BURL I. NEWTON AND SHARON C. NEWTON,**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

MAY IT PLEASE THE COURT:

Plaintiffs and Counter-claim Defendants, Burl I. Newton and Sharon C. Newton oppose

the motion for summary judgment filed herein by Defendants and respectfully show that the

motion should be denied for the reasons set forth in this Memorandum.

**I.**
**OVERVIEW OF OPPOSITION**

The two lynchpins of the Defendants' motion are (1) that the Plaintiffs' demand for

interest rate relief on the Edgehill Ace Hardware, Inc. ("Edgehill Ace") $700,000 promissory

note ("the Edgehill Ace Note"), made pursuant to 50 U.S.C. App. §527, was somehow subject to

approval by the U.S. Small Business Administration ("SBA"); and (2) that the Edgehill Ace

Note itself was never protected by the Servicemembers Civil Relief Act ("SCRA") because it

was a corporate debt and not that of an individual.  As will be explained below, precisely this

same incorrect position has been unsuccessfully urged by other banks in at least two reported

cases and the same result should obtain in this case.  Moreover, Defendants offer no statutory or

jurisprudential basis whatsoever for their claim that the SBA had "approval rights" over whether the interest rate on the SBA-guaranteed loan to Edgehill should be reduced to 6% upon proper demand by then-Commander Sharon C. Newton, U.S. Navy.  Nothing in the SCRA makes an SBA-guaranteed loan any different from other pre-service obligations.  The SBA and the Bank of McKenney ("Bank") were both required to follow federal law, and neither did.

As for the portions of the Defendants' motion pertaining to damages and the Plaintiffs' demand for relief under 50 U.S.C. App. §591 (for a stay of the payment obligation), no aspects of this litigation could be more fact dependent and therefore inappropriate for determination by summary judgment.  *See* Declaration of Burl I. Newton, Ex. 34. Accordingly, a motion for summary judgment on those grounds should not be granted.

In the Motion for Partial Summary Judgment filed herein by Plaintiffs (Doc. 31), Plaintiffs seek a ruling that the Bank is equitably estopped from now attempting to litigate the issue of  material effect.  In 2005, the Bank granted SCRA protection to all of the Plaintiffs' loans except for the Edgehill Ace Note and never contested whether or not the Newtons were materially affected by Sharon Newton's call to active duty.  The Bank also has admitted that the *only* reason that the interest rate relief was not granted on the Edgehill Ace Note was because the SBA told them the requested relief could not be granted.  Whether or not the Newtons were materially affected did not enter into the Bank's analysis or decision.

Nearly seven years after the fact, the Bank now attempts to contend that she was never entitled to the protections of the SCRA in the first place.  If this Court should not sustain the Plaintiffs' motion that the Bank is now equitably estopped from contesting material effect, the Plaintiffs are entitled to have a jury make the determination of whether or not they were

materially affected by the military duty of Sharon C. Newton and whether or not they are entitled to the Congressionally-sanctioned stay in enforcement of their obligation to the Bank (their claims for relief under 50 U.S.C. App. §591).  Additionally, Plaintiffs have clearly alleged that they have suffered damages, a determination of which is a fact-based inquiry.  As will be shown below, Plaintiffs claims are for more than just the economic damages resulting from the illegal foreclosure on the real estate and inventory of the Edgehill Ace Hardware.  They are also suing for non-economic damages including damages for personal humiliation, embarrassment, outrage, mental anguish and/or emotional distress as well as punitive damages against the Defendants.  Such damages can be awarded in SCRA cases and whether or not those damages are proven is, once again, purely a factual determination for a jury to make.  Summary judgment would be inappropriate in such a case.

As Plaintiffs argued in their Motion for Partial Summary Judgment (Doc. 31), the real problem that has led to this litigation is the Bank's continual refusal to view this matter as anything other than a routine foreclosure on the collateral left after a failed business loan.  It is not.  The Plaintiffs fell within a specially protected group – American servicemembers and their dependents – for whom Congress has enacted special protections in the SCRA.  If the Edgehill Ace Hardware had been a profitable, thriving business, the Newtons would have continued paying the Edgehill Ace Note as it became due.  But it was a failing business, weakened even more by Sharon Newton's call to active military duty.  At that point, the Newtons were at their most vulnerable and the Bank acted as though it held all the cards.  The Newtons' business was failing and Sharon Newton was ordered to leave home and go nurse sick and wounded sailors and Marines for nearly seven years.  At that point, the Newtons needed the protections Congress

had enacted for them more than ever before – and yet the Bank treated the entire situation as "one more bad loan on which we have to foreclose and seize as much collateral as we can to pay ourselves back 100 cents on the dollar."

The SCRA was intended for just this kind of situation, observing that the principal protections in Title III of the SCRA deal with evictions (50 U.S.C. App. §531 – why else would that be necessary if servicemembers failed to pay their rent?); termination of installment contracts (50 U.S.C. App. §532 – why else would that be necessary unless servicemembers defaulted on installment contracts?); foreclosures (50 U.S.C. App. §533 – why else would that be necessary if servicemembers did not  default on mortgage loans); and enforcement of storage liens (50 U.S.C. App. §537 – why else would that be necessary if servicemembers paid their storage fees on time?).

The SCRA is the Congressional recognition that a nation has to act with special care to protect its most vulnerable people.  The ordinary situation of a bank –  with all its assets and strength – pitted against virtually powerless borrowers in default (who are now facing efforts by the Bank to seize their home and farm) is radically altered when the borrowers are protected by the SCRA.  It is this lawsuit for anticipatory relief and damages that affords the Newtons the opportunity to receive the justice in the form of the SCRA protections the Bank has stripped from them until now, and to receive damages for the SCRA violations the Bank has committed.

## II.
## LISTING OF CONTROVERTED FACTS

Plaintiffs respond to the listing of uncontroverted facts presented by Defendants as follows:

1. Admitted.

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted.

6. Admitted in part, but it is denied that there was a need for any loan modification in August 2005 or that the execution of the document prepared by the Bank in any way altered the status of the Edgehill Ace Note as a pre-service obligation of Plaintiffs.  *See* the discussion in Document 31 at page 24.

7. Admitted in part, but it is denied that Sharon C. Newton is not a beneficial owner of the real property located at 20902 and 20703 Courthouse Road, Dinwiddie, Virginia.  *See* the discussion in Document 31 at pp. 32-33.

8. Admitted.

9. Admitted.

10. Admitted.

11. Denied.  A profit of over $65,000 is not a slight profit.  *See* Document 34-24, pp. 1-4 (Report of Dr. Robert Cook).  The hardware business paid its obligations until it was closed.

12. Admitted in part, but denied as written that Edgehill Ace "struggled with making timely payments to the Bank".  The records reflect that during the period of operation of the hardware store, Edgehill Ace paid the Bank approximately $515,905 in principal and over $400,000 in interest on its loans.  *See* Document 34-24, pp. 2-4 (Report of Dr. Robert Cook).

13. Denied.  The time frame within which it is alleged Edgehill Ace did not make timely payments is not specified.

-5-

14. Admitted that interest only payments were authorized for a period of 18 months, but denied as to whether or not such an agreement constituted a modification of the Edgehill Ace Note so as to render it anything other than a pre-service obligation of the Plaintiffs. *See* the discussion in Document 31 at p. 24.

15. Admitted.

16. Admitted, although that notice was later rescinded and operations of the hardware store did not cease in January 2006 but continued to April 2006. *See* Document 34-2, p. 75 (Deposition of Burl I. Newton) .

17. Admitted.

18. Admitted.

19. Denied as written. The request for interest only payments and the 6% maximum interest rate on the Edgehill Ace Note is Document 34-14, numbered BOM 00039. The second letter, also dated June 15, 2005, specifically referenced the Soldiers' and Sailors' Civil Relief Act (but incorrectly cited the applicable section by using the former section number under the SSCRA instead of the new section number under the SCRA) and referred to both the Edgehill Ace and B&S notes. The second letter is Document 34-14, numbered BOM 0040 (not BOM 0039 as undisputed fact number 19 alleged in Defendants' memorandum in support of its motion (Doc. 34).

20. Denied as written. The letter dated June 15, 2005 that is marked as BOM 00040 and which is the second page of Document 34-14 specifically references both the Edgehill Ace Note and the B&S Note and references the SSCRA and federal law as the basis for the interest reduction request.

21.   Admitted, although it is specifically denied that the permission of the SBA was in any way required before the Bank was required to either comply with the June 15, 2005 demand of Plaintiff or seek judicial relief from the demand.  *See* Document 32, pp. 18-24 and the various cases and exhibits cited therein.

22.   Admitted, although it is once again shown that the permission or approval of the SBA to comply with 50 U.S.C. §527 was not required.

23.   Admitted, although it is once again shown that the permission or approval of the SBA to comply with 50 U.S.C. §527 was not required.

24.   Denied.  The Newtons never agreed that the SBA had any veto authority over compliance with 50 U.S.C. App. §527.  Moreover, Plaintiffs show that they never waived any SCRA rights in any document that would comply with the requirements of 50 U.S.C. App. §517.

25.   It is admitted that the Bank notified Plaintiffs in February 2006 of the position of the SBA.  When the Bank actually learned of that position is a fact which Plaintiffs can neither admit nor deny.

26.   Admitted.  However, Plaintiffs point out that the Bank's ultimate compliance with 50 U.S.C. App. §527 did not occur until long after the damages had been done to Plaintiffs by virtue of the foreclosure, seizure and sale of the hardware store real estate and all its inventory.

27.   Admitted.

28.   The initial phrase is denied as argumentative.  The remainder of number 28 is admitted.   Further responding, Plaintiffs show that they specifically reserved all rights they had to sue for violations of their SCRA rights in the B&S bankruptcy proceedings.

29.   Admitted.

30.  The first sentence is admitted.  The second sentence is denied in that Plaintiffs reserved all their rights to sue for damages under the SCRA for the foreclosure.  Further responding, Plaintiffs show that Edgehill Ace Hardware, Inc. was not before the bankruptcy court and the subsequent nonjudicial foreclosure on the inventory of that corporation on May 23, 2007 was in violation of the SCRA.

31.  Denied.   The Bank is now exercising its alleged rights against the Newtons in this lawsuit.  The Bank is at this very moment pursuing the Newtons and attempting to seize and sell their home and farm.  *See* Document 20   (Answer and Counterclaim of Bank).

32.  Receipt of the notice is admitted, but Plaintiffs show that no court order was ever obtained prior to the nonjudicial seizure, foreclosure and sale of the inventory of Edgehill Ace Hardware, Inc.  *See* Document 32-2, p. 68 (being p. 52 of the Deposition of Kimberly Swain).

33.  Admitted, but Plaintiffs show that certain additional personal property items were sold in the May 23, 2007 sale and not credited to them.  *See* Document 34-2, p. 99 (Deposition of Burl I. Newton).

34.  Admitted.  Further responding, Plaintiffs show that such auction was without benefit of a court order entered prior to the sale and therefore was in violation of 50 U.S.C. App. §§532 and 533.

35.  Denied as written.  The Newtons have now petitioned for the anticipatory relief afforded them under 50 U.S.C. App. §591.

36.  Denied.  The Bank's own documents clearly indicate that payments were made on the Edgehill Ace Note following the illegal foreclosure sales in 2007.  *See* Document 32-2, pp. 37-42.

-8-

37.  The portion of the first sentence that characterizes the 2000 profit as "very slight" is denied as argumentative.

38.  Denied as written.  The Bank's own documents clearly indicate that payments were made on the Edgehill Ace Note following the illegal foreclosure sales in 2007.  *See* Document 32-2, pp. 37-42.

39.  Admitted.

40.  Admitted.

41.  Admitted.

## III.
## ARGUMENT

**A.     The SBA Does Not Enjoy Veto Power Over Demands for Compliance with 50 U.S.C. App. §527**

The interest rate relief provision in the SCRA applies to all pre-service obligations:

> "An obligation or liability bearing interest at a rate in excess of 6 percent per year that is incurred by a servicemember, or the servicemember and the servicemember's spouse jointly, before the servicemember enters military service shall not bear interest at a rate in excess of 6 percent –
> (A) during the period of military service and one year thereafter, in the case of an obligation or liability consisting of a mortgage, trust deed, or other security in the nature of a mortgage; or
> (B) during the period of military service, in the case of any other obligation or liability."

50 U.S.C. App. §527(a).  There is not a single word in the entire SCRA about the SBA, nor does the interest rate provision (Section 527) differentiate in any way between who the creditor might be for servicemembers' pre-service obligations.  The lack of understanding by the Defendants about this central point of the case is the primary reason for this lawsuit.

The Bank's officer assigned to this loan, Kimberly Swain, candidly admitted at her

deposition that the only reason the Bank did not lower the interest rate on the Edgehill Ace Note was because the SBA refused to allow the reduction. The fatal flaw in such a position, obviously, is that the SCRA does not grant any veto power to the SBA over whether it will comply with the SCRA or not. The Edgehill Ace Note was a pre-service obligation. Therefore, unless the Bank had gone to court when the demand for relief was received and challenged whether Sharon and Burl Newton were materially affected by virtue of her call to the colors in paying the Edgehill Ace Note at the contract rate, the interest rate had to be lowered on that obligation in the same manner as the Bank had lowered the interest rate on all the other pre-service obligations of the Newtons – as required by the SCRA.

The Defendants cite *Cathey v. First Republic Bank,* 2001 U.S. Dist. LEXIS 13150 (W.D. La. July 6, 2001) in their motion. Undersigned counsel represented Lt Col Cathey in that case. It is crystal clear from the court's opinion granting summary judgment in favor of the Catheys that the loans in that case to the Catheys' Subchapter S corporation, Stewart A. Cathey & Sons, Inc, were made through an SBA guaranteed loan program. The Catheys had been required to personally guarantee the notes and mortgage their home as additional collateral for the loans. The fact pattern is virtually the same as found in this case. The court in *Cathey* ruled that the bank had violated the interest rate provisions of the Soldiers' and Sailors' Civil Relief Act ("SSCRA", the predecessor to the SCRA) and that violation caused the Catheys damages which they could seek to recover in a jury trial. As a matter of interest, the case settled on the eve of trial for $2,350,000 and the bank dismissed any claim for further payments on the notes. The *Cathey* decision also made it plain that whether the Catheys had personally signed the notes or not was immaterial, since they had also personally guaranteed payment of the notes, as is the

case in this matter.

Plaintiffs have also previously cited the Court to *Fifth Third Bank v. Schoessler's Supply Room, L.L.C.,* 190 Ohio App. 3d, 940 N.E. 2d 608 (2010), a case in which the SBA loan debt of a corporation in which a mobilized National Guardsman was 85% owner was determined to be protected under the SCRA in a default judgment situation.

In short, there is no statutory or jurisprudential basis for any claim that reduction of the interest rate on the SBA note involved in this case was dependent in any way on the concurrence of the SBA.  The SCRA does not differentiate between pre-service obligations to the SBA and pre-service obligations to all other creditors.  In addition to the plain language of Section 527 of the SCRA, Plaintiffs have cited jurisprudential authority that loans guaranteed by the SBA are subject to the same interest rate cap as all other types of obligations.  That basis for the Defendants' motion for summary judgment is entirely without merit and should be denied.

> **B.      When an Obligation is Personally Guaranteed by a Person Who Thereafter Becomes Protected by the SCRA, the Obligation –Whether It Is That of a Corporation or Not –  Becomes Protected by the SCRA.**

The other main contention of the Defendants is that the Edgehill Ace Note was a corporate debt and therefore not protected by the SCRA.  The cases cited by Plaintiffs in their motion for partial summary judgment (*Cathey, supra; Linscott v. Vector Aerospace*, 2006 WL 1310511 (D. Or. 2006), and *Fifth Third Bank v. Schoessler's Supply Room, L.L.C., supra*) all held that corporate obligations of corporations wholly-owned by persons protected by the SSCRA or the SCRA were entitled to the protections of those acts.  In addition to those cases, the Court will also find that in *Application of Pickard*, 187 Misc. 400, 60 N.Y.S. 2d 506 (1946), a domestic corporation wholly owned by a servicemember  (the assets of which were a fully-

rented apartment building) was entitled to the protections of the SSCRA's provision on anticipatory relief (then 50 U.S.C. App. §590, which is currently 50 U.S.C. App. §591).

The isolated quotes from the cases cited by Defendants in Section II.A.3. of their memorandum, are inapplicable to the facts of this case. None of the cited cases dealt with a corporate obligation that had been personally guaranteed by a person who thereafter became protected by the SSCRA. In *Bolz Cooperage Corporation v. Beardslee*, 245 S.W. 611 (1922), the manager of the plaintiff had been drafted for a short time during World War I. He was the manager of Bolz Cooperage Corporation. The corporation sued the Estate of Beardslee on an account and the defendant claimed the suit had been filed too late under Missouri law. The plaintiff tried to claim the tolling provision of the SSCRA to justify the late-filed suit but the court declined to expand the SSCRA's tolling provision to a corporation in which the servicemember was merely an employee.

In *Hettinger v. American Veterans of World War II*, 38 Berks 109, 56 Pa. D.&C. 566, 1946 WL 2624 (Pa. Com. Pl. 1946), the eviction of an unincorporated association that merely included within the ranks of its membership some servicemembers was allowed by the court. As the court in *Hettinger* noted, "[w]e are not concerned with any obligation or liability of any soldier or sailor" in the eviction action. In *Personal Finance Co. Of N.Y. v. N.Y.U. Garage, Inc.*, 180 Misc. 309, 44 N.Y. supp. 2d 353 (1943), no facts of any kind are given in the two paragraph *per curiam* order of the court. Apparently a corporation had attempted to stay a case citing the SSCRA's stay provision. Presumably, an employee of the defendant corporation was a servicemember during World War II, but that is not stated in the brief order of the court. With no facts of any kind given, the case is of dubious precedential value. At any rate, whether a

-12-

corporation was entitled to a stay of proceedings is an entirely different inquiry from whether a

corporate obligation that is personally guaranteed by a person who thereafter becomes protected

by the SCRA is subject to the protections of the SCRA.

Finally, in *In re Charkin*, 180 Misc. 604, 41 N.Y.S. 2d 503 (1943), an action to enforce a

mechanic's lien brought more than a year after the lien was filed was not allowed because of a

failure of the lienor corporation to prove it was entitled to the tolling provisions of the SSCRA.

Two of the employees of the lienor, Maher & Son, Inc., were in military service, but there was

no evidence of what their respective stock holdings were in the corporation during the period of

activity involved.  The court ruled "[u]nder all the circumstances, I am constrained to hold that

the corporate lienor is not entitled to relief under the Federal or State Soldiers' and Sailors' Civil

Relief States . . . ."  Clearly, the New York court was concerned that the servicemembers had not

indicated in their affidavits "[w]hat their respective stock holdings are and were in the

corporation during the period of activity . . . ." *Id.* at 503.

It was the Bank that insisted on the personal guaranty of the Newtons to further secure

the debt of Edgehill Ace Hardware, Inc.  Under the clear language of the guaranty agreement

(Doc. 32-1, p. 67), the Newtons were both personally liable for the debts of Edgehill Ace

Hardware, Inc.  In fact, the guaranty agreement the Bank had the Newtons sign in connection

with SBA Loan No. GP-211, 714-40-05-RICH (the same SBA loan number that appears on the

July 6, 1998 Edgehill Ace Note itself), identifies the Newtons as "the Debtor" on the loan.   If

the Bank classified the Newtons as the "Debtor" in the guaranty agreement executed on an SBA

form prepared by the Bank which the Newtons were required to sign personally, it should have

been abundantly clear to all involved from the date of Sharon Newton's mobilization to active

-13-

duty that the Edgehill Ace Note was protected by the SCRA, no matter that another debtor on the debt was the Plaintiffs' wholly-owned corporation.

The Bank is the party to this lawsuit that insisted upon the personal guarantees – and personal liability – of the Newtons for all the debt of Edgehill Ace.  The Bank got the security it demanded, but when the Newtons became protected under the SCRA (Sharon Newton by virtue of her call to active duty and Burl Newton by virtue of 50 U.S.C. App. §538 and the actions of the Bank with regard to all their other debts), the debts of Edgehill Ace became protected by the SCRA.

**C.  The Edgehill Ace Note Was Not Materially Modified After June 2005 and Is a Pre-Service Obligation**.

In something of an apparent after-thought, the Bank argues (at page 22 of Doc. 34) that the Edgehill Ace Note was modified after Sharon Newton entered active duty and therefore it was not protected by the SCRA.  By simple reference to Exhibit Y attached to the Bank's Memorandum in Support (Doc. 34), it is clear that no new funds were loaned by the Bank and that the only reason for the modification agreement was to reduce to writing the Bank's agreement (following SBA voluntary guidelines that had been expired since January 1, 2003 according to Doc. 34-22) to allow the Newtons interest-only payments on the Edgehill Ace Note. The "loan application" even refers to the reason it was being completed: to obtain SCRA benefits.

If the Bank contends that Exhibit Y (Doc. 34-25) or the Loan Modification Agreement (Doc. 34-12) constitute waivers of any SCRA rights, then the documents fail under the specific requirements of 50 U.S.C. §517 in that any such waivers must be in an instrument "separate from the obligation or liability to which it applies",  must "specify the legal instrument to which the

waiver applies" and, since it would constitute a waiver of the Plaintiffs' rights under numerous provisions of the SCRA (Sections 527, 533, 538, 591, 596 to name but a few), must be in at least 12 point type (*see* 50 U.S.C. App. §517(a), (b)(1) and (c)).

If the Bank claims the Loan Modification Agreement (Doc. 34-12) constitutes a new obligation incurred after Sharon Newton entered active duty, she and her husband would have been waiving numerous SCRA rights and protections.  There is not a single word in the document about her waiving any rights and even if the document contained such language, it would still not comply with the requirement in the SCRA that any such waiver be clear and precise as to the rights being waived and, moreover, that the waiver be in an instrument *separate and apart* from the document that created the obligation.

### D.    The Bank's Nonjudicial Foreclosures Violated the SCRA.

The Bank admittedly foreclosed on the hardware store real estate and, thereafter, auctioned off the Edgehill Ace inventory in a nonjudicial foreclosure sale.  The Bank asserts in its Motion that its nonjudicial foreclosure actions were not subject to the SCRA because neither the hardware store real estate nor the inventory of the hardware store were owned by the Plaintiffs, but instead, were owned by either B&S Commercial Properties, LC ("B&S") or Edgehill Ace Hardware, Inc., two business entities wholly-owned by the Newtons.   Plaintiffs suggest that those arguments by the Bank constitute yet another example of the impermissibly narrow interpretation of  SCRA coverage that has characterized the Bank's entire approach to this matter, as opposed to the expansive interpretation of the Act that is mandated by the jurisprudence interpreting the SSCRA and the SCRA.  *See, e.g., Boone v. Lightner,* 319 U.S. 561, 575 (1943), *LeMaistre v. Leffers,* 333 U.S. 1,6 (1948), *Gordon v. Pete's Auto Service of*

-15-

*Denbigh, Incorporated,* 637 F. 3d 454, 458 (4th Cir. 2011) ("We are mindful that the SCRA –

like its predecessors – 'must be read with an eye friendly to those who dropped their affairs to

answer their country's call.'[citations omitted]"

The Bank argues that title to the hardware store real estate was in B&S Commercial

Properties, LC and the inventory of the hardware was owned by Edgehill Ace Hardware, Inc.,

and therefore all protections from the SCRA were thereby lost since those were company assets.

However, virtually that same argument by the bank in *Cathey, supra,* was rejected by the court

when it noted:

> "In an effort to spin silk from a sow's ear, the Bank suggests that the plaintiffs are not the
> real parties in interest; rather, that their corporation is.  Yet, it is the plaintiffs' home
> which was put up as collateral for the loans and it is plaintiffs' home upon which
> foreclosure proceedings were instituted.  It is plaintiffs who signed the notes and it is
> plaintiffs who, although a redundant requirement, guaranteed the loans.  It is the plaintiffs
> whose labor and expertise was required to operate the corporation profitably so that its
> obligations could be met.  To suggest that they are not the real parties in interest is simply
> ludicrous.
>
> ". . . . Defendants' suggestion that, because a corporation is a separate legal entity, it can
> run itself while the serviceman is away is specifically rejected, especially where, as here,
> the corporation is a family corporation which depends on its owners' presence for
> profitability."

*Cathey v. First Republic Bank*, 2001 WL 3620354, at *4-*5 (W.D. La.).  The real parties in

interest in the disposition of the assets of both B&S and Edgehill Ace Hardware *were the*

*Newtons*, persons protected by the SCRA.  No other shareholders lost assets when those

foreclosures took place – only the Newtons.  No other persons are left owning collateral the

Bank now seeks to seize and sell – only the Newtons.

The Bank contends that the bankruptcy consent order (Doc. 34-17) constituted a court

order authorizing the sale of the B&S real estate that would satisfy 50 U.S.C. App. §533.

-16-

However, as is clear from the facts, the Bank never went to court prior to initiating the prohibited nonjudicial foreclosure action against B&S (the debts of which were also personally guaranteed by the Newtons, and the assets of which the Bank and the SBA had required to be cross-collateralized to secure the Edgehill Ace Note).  Burl Newton, in an effort to stop the nonjudicial foreclosure, filed a Chapter 11 bankruptcy action for B&S.  Although the Bank ultimately succeeded in getting the stay lifted, neither of the Newtons consented to the order and both reserved their rights to sue for damages for violation of the SCRA.  Had Burl Newton not filed the bankruptcy action, the Bank would have forged ahead with a nonjudicial foreclosure which the Bank had already advertised.  *See* Document 32-2, p. 10, the Public Notice of nonjudicial foreclosure sale published by the Bank on June 21, 2006.  The SCRA (50 U.S.C. App. §533(c)) requires that a seizing creditor obtain a valid court order *before* any sale, foreclosure or seizure takes place.  Such a court order can only be entered after service on the servicemember and an opportunity to be heard.  That protection exists to enable the servicemember to plead for a stay of the proceedings or an adjustment of the payment obligation, which a court is empowered to do pursuant to 50 U.S.C. App. §533(b).  The Bank did not seek such a court order – it only opposed the Chapter 11 filing and obtained a lifting of the automatic stay.

Even if the Court accepts the Defendants' argument as to the B&S real estate, the bankruptcy court's order could not have affected the assets of Edgehill Ace Hardware, Inc., because that entity was not before the bankruptcy court.  The Bank has not and cannot produce any court order, entered prior to the nonjudicial sale, foreclosure or seizure of the assets of Edgehill Ace Hardware, Inc. (the inventory of the hardware store), authorizing such liquidation sale.  As such, at a minimum and regardless of the Court's ruling regarding whether or not the

nonjudicial sale of the B&S real estate violated the SCRA,  the nonjudicial foreclosure and sale

of the inventory of Edgehill Ace Hardware violated 50 U.S.C. App. §533.

>    **E.**     **The Real Parties at Interest Were the Newtons, Regardless of the Legal
>              Entity That Held Title to the B&S Real Estate and the Edgehill Ace
>              Hardware Inventory.**

The Bank also argues that the nonjudicial foreclosures of the assets of both B&S and

Edgehill Ace did not violate the SCRA because the assets were owned by business entities and

not the Newtons personally, even though both of those business entities were owned solely by

Burl and Sharon Newton.  Such an argument again reflects the impermissibly narrow view of the

scope of SCRA protection the Bank has taken throughout this entire process, an approach that is

not endorsed by the many courts that have called for a liberal interpretation of the SCRA to

afford protection instead of denying it.    As the court in *Cathey v. First Republic Bank,* 2001

WL 36260354 (W.D. La. 2002) noted:

> "Plaintiff Stewart A. Cathey was, at all pertinent times, in accordance with 50
> App § 526, a person in the military service who had incurred an obligation and liability
> bearing interest at a rate in excess of 6%. Defendants' suggestion that 'the Bank made no
> loans to plaintiffs, only to SACS, Inc.' is simply incorrect and, as plaintiffs, through
> counsel, point out, the Bank's failure to understand this is the reason for this litigation.
> Every single promissory note at issue was signed individually by each plaintiff and by the
> corporation. The notes expressly provide that all three 'promise to pay.' All three are
> referred to collectively as borrower in the note and in the business loan agreement. *Both
> plaintiffs and the corporation are referred to as borrower in all of the commercial
> guarantee agreements.* This is not a case where loans were executed by a corporation
> which happened to be owned in part by a serviceman. Rather, this case involves loans
> incurred by a serviceman. The fact that the loans were also incurred by others (his wife
> and his family's corporation) is irrelevant to my consideration.

> "Any doubts that may arise as to the scope and application of the Act should be
> resolved in favor of the military person. However, the Act may not be used as a sword
> rather than a shield. <u>*Engstrom v. First Nat. Bank of Eagle Lake,*</u> 47 F.3d 1459 (5th
> Cir.1995), <u>*cert. den.,*</u> 516 U.S. 818, 116 S.Ct. 75, 133 L.Ed.2d 35.

> "In an effort to spin silk from a sow's ear, the Bank suggests that the plaintiffs are
> not the real parties in interest; rather, that their corporation is. Yet, it is the plaintiffs'

home which was put up as collateral for the loans and it is plaintiffs' home upon which foreclosure proceedings were instituted. It is plaintiffs who signed the notes and *it is plaintiffs who, although a redundant requirement, guaranteed the loans*. It is the plaintiffs whose labor and expertise was required to operate the corporation profitably so that its obligations could be met. To suggest that they are not the real parties in interest is simply ludicrous."

*Id.* at pp. *3-*4 (emphasis added). *See also Linscott v. Vector Aerospace*, 2006 WL 1310511 (D. Or. 2006), and *Fifth Third Bank v. Schoessler's Supply Room, L.L.C.*, 190 Ohio App. 3d, 940 N.E. 2d 608 (2010).

The fact that Plaintiffs chose to place title to the real estate and the inventory of the hardware store in two business entities owned entirely by them cannot and should not deprive them of the protections of the SCRA when the two co-owners became protected by the SCRA (Sharon Newton as a servicemember and Burl Newton as a dependent, protected under 50 U.S.C. App. §§ 513 and 538).  A liberal interpretation of the SCRA in favor of coverage of the Act is appropriate because otherwise, customary and ordinary business planning by persons who may thereafter become protected by the SCRA would be thwarted if the business owners felt they could not incorporate or form a limited liability company for fear that the protections of the SCRA would not attach to their assets.  As in *Cathey*, this is not a corporation or business in which a servicemember was a mere shareholder.  Both B&S and Edgehill Ace Hardware, Inc. were entirely owned by Burl and Sharon Newton and those assets were protected by the SCRA, both as to the interest rates on the notes and as to the prohibition against nonjudicial foreclosures.

The liberality of finding coverage under the SCRA is best illustrated by the language of 50 U.S.C. App. §596, a relatively new provision in the Act.  That section provides that "[i]f the trade or business (*without regard to the form in which such trade or business is carried out*) of a

servicemember has an obligation or liability for which the servicemember is personally liable, the assets of the servicemember not held in connection with the trade or business may not be available for satisfaction of the obligation or liability during the servicemember's military service." (Emphasis added.) Congress is not so much concerned with the form of a servicemember's business (sole proprietorship, corporation or partnership) as it is with protecting assets of a servicemember not held in connection with the trade or business while the servicemember is on active duty (as now-Captain Sharon C. Newton is to this day).

**F.      The Newtons Have Suffered Both Economic and Non-economic Damages Which Can Be Recovered in a Suit for Violations of the SCRA.**

The Bank argues that the Newtons have not suffered any damages, apparently referring only to economic damages in the form of loss of future profits from the hardware store. The expert report of Dr. Robert Cook (Document 34-24, along with his testimony in deposition on April 11, 2012 which has not yet been transcribed) established that the Newtons, as a direct result of the foreclosures by the Bank, lost the opportunity to recover nearly $175,000 in loans they had made to the hardware store. Whether these economic damages can be proven or not is a factual determination and not an appropriate matter for disposition in motion practice. However, Plaintiffs seek far more than mere economic damages from the Bank.

Any fair reading of the evidence submitted by both parties in the motion practice of this case leads to the undeniable conclusion that the Newtons have protested from the start of this conflict to the present to anyone and everyone who would listen that their rights under the SCRA were being violated. *See, e.g.,* the listing of agencies to which Burl Newton had written contained in Kimberly Swain's email dated October 22, 2010 to the SBA (Doc. 32-2, p. 36): Judge Tice, the U.S. Attorney's office in Richmond, the SBA, Senator Mark Warner's office and the Federal

Reserve Bank of Richmond. Those complaints – which ultimately resulted in the SBA reversing its position on SCRA coverage for the Edgehill Ace Note *and* the Bank's reversal of its position by crediting all the over-charged interest back to the Newtons' account (but not until after both foreclosures had already taken place followed by this suit seeking to foreclose on their home and farm) were successful for one simple reason: Burl and Sharon Newton were right all along. But their long struggle to prove the point was not without considerable agony, mental anguish, embarrassment, outrage, humiliation and stress beyond what anyone could reasonably be expected to bear silently. They have now sued to recover their damages and attorneys fees, to which they are entitled . *See* Declaration of Burl I. Newton, Ex. 34.

Non-economic damages for violations of the SCRA can be awarded for the same categories of damages allowed in other federal consumer-protection-type statutes, such as the Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. §§1692 *et seq.*, and the Fair Credit Reporting Act ("FCRA"), 17 U.S.C. §§1681 *et seq.* Each of those statutes protects a specified category of persons (consumers) and grants to them special protections. In like manner, the SCRA defines and protects a specific category of persons (servicemembers) and provides for them protections in the form of suspension of certain obligations for the duration of their period of service. Additionally, SCRA rights are federally protected rights and countless federal courts have recognized tort-like claims for damages under such statutes as 42 U.S.C. §1983.

As the court observed in *Hurley v. Deutsche Bank Trust Company Americas et al*, Case 1:08-cv-361 (W.D. Mich. 02/04/2011), Doc. 307 at pp. 10-11:

> "Under both the FDCPA and the FCRA, 'non-economic damages' are recoverable as a component of actual damages, including damages for personal humiliation, embarrassment, mental anguish and/or emotional distress. *See Bach v. First Union Nat. Bank,* 149 F. App'x 354, 361 (6th Cir. 2005); *Hoffman v. GC Servs. Ltd. P'ship, et al.,* No.

3:08-cv-255, (E.D. Tenn. May 11, 2010) (citing *Milton v. Rosicki, Rosicki & Assoc., P.C.*, 2007 WL 2262893, at *3 (E.D.N.Y. 2007)); *Pourfard v. Equifax Info. Servs. LLC*, No. 07-854-AA, 2010 WL 55446 (D. Or. Jan. 7, 2010); *Guimond v. Trans Union Credit Info. Co.,* 45 F. 3d 1329, 1333 (9th Cir. 1995). Accordingly, the Court holds that non-economic damages, including mental anguish and emotional distress, are also recoverable for a violation of the SCRA. Moreover, to prove such damages, Plaintiffs need not meet the same standards required by Michigan law to establish intentional or negligent infliction of emotional distress. *See Hoffman, supra,* at *29-31 (noting a split of authority on the issue, but holding that emotional damages may be recovered under the FDCPA without proving the elements of state law claims for intentional or negligent infliction of emotional distress). In fact, Plaintiffs' own testimony may suffice, so long as it sufficiently explains the injury and consists of more than mere conclusory statements. *See Bach*, 149 F. App'x at 361.

      "In addition, Plaintiffs' actual damages would include economic damages in the form of any equity in the real estate. That is, Plaintiffs may recover the fair market value of the property at the time of the foreclosure sale less the amount of the mortgage debt. *See e.g., Smith* v. *J.P. Morgan Chase Bank NA,* No. H-10-3730, 2010 WL 462209, at *2 (S.D. Tex. Nov. 4, 2010); *Blair v. GMAC Mortgage, LLC,* No. 3:09CV10-SA-SAA, 2009 WL 324053, at *2 (N.D. Miss. Feb. 9, 2009); *Mascot v. Rudman*, 37 F. Supp. 588, 593 (D. N.H. 1940); *Roylston v. Bank of Am., N.A.*, 290 Ga. App. 556, 559, 660 S.E. 2d 412, 417 (Ga. Ct. App. 2008); *Adkinson v. Hannah*, 475 S.W.2d 39, 43 (Mo. 1972)."

Because Plaintiffs have made claims for both economic and non-economic damages, they respectfully suggest that the Court should deny the Defendants' motion for summary judgment claiming that the Newtons have not suffered any damages. The evidence before the Court (Declaration of Sharon C. Newton, Doc. 32-1, p. 1 as well as the Declaration of Burl I. Newton submitted as Exhibit 34 with this Opposition Memorandum) contains abundant evidence of the emotional distress suffered by Captain Newton and Burl Newton throughout this long struggle, setting up a question of fact that is properly resolved by a jury and not in motion practice.

### G.      Whether 50 U.S.C. App. §596 Was Violated or Not is a Question for the Jury.

The Bank argues (at page 23 of Document 34) that the Newtons recovered all of their personal property from the hardware store before the nonjudicial sale of the inventory and fixtures of the Edgehill Ace Hardware store. However, the Bank concedes that Burl Newton testified at

his deposition that a DR Fields mower deck that he owned personally was not recovered and was apparently sold in the nonjudicial foreclosure sale.  Whether the mower deck or any other personal property of the Newtons was or was not sold at the nonjudicial auction is a fact issue for the jury's determination and it would not be appropriate to grant the Bank's motion for summary judgment when even the Bank admits there are contested facts on the issue.  The Bank says it did not sell any of the Newtons' personal property and Burl Newton testified that the Bank did – a classic factual dispute that prevents summary judgment.

> **H.   The Bank's Contention that the Edgehill Ace Note Was Not Entitled to SCRA Protection Because of Alleged Pre-Service Defaults Is Incorrect.**

The Bank alleges that the Edgehill Ace Note was in default prior to Sharon Newton's call to active duty and therefore all SCRA protections on that obligation are lost.  As authority for such a narrow interpretation of the SCRA, the Bank cites two New York World War II cases: *Franklin Society for Home-Building & Savings v. Flavin,* 265 A.D. 720, 40 N.Y.S. 2d 582 (1943); and *Creamer v. Censoplano*, 183 Misc. 716, 52 N.Y.S. 2d 862 (1945) (a trial level decision that was not appealed).  Neither of those cases remotely resembles the facts in this case.

*Franklin Society* was a summary judgment action by the obligee on a home mortgage for which, according to the brief recitation of facts found in the opinion, the servicemember's "defaults in payment of principal, interest and taxes occurred long before his entry into the armed forces.  Moreover, no personal judgment is sought against him by respondent."  *Franklin Society, supra* at 583.  The obvious distinction between that case and the Bank's action against the Newtons is that there was never any long-term default on payment of the Edgehill Ace Note prior to Sharon Newton's call to active duty.  Any allegation that the Newtons' loans had been in long-term default before June 2005 is not supported by the facts.  While there may have been an

occasional late payment, the taxes and insurance had been paid on the collateral and the Newtons were working diligently to keep their obligations current.  Moreover, the Bank's own records reflect payments on the loan after Sharon Newton had gone on active duty of $13,360.79 on August 29, 2005, $3,856.42 on October 17, 2005 and $2,621.06 on November 14, 2005, for total payments on the loan *after* Sharon Newton entered active duty of $19,838.26.  *See* Document 32-2; and page 23 of 30 from the Bank's loan payment history (Ex. 35) and the Declaration of Burl I. Newton (Ex. 34), included as exhibits to this Opposition Memorandum.

By equating the Newtons with the mortgagor in *Franklin Society,* the Bank is attempting to portray the Newtons as complete deadbeats, and that simply is not the case.  The Bank has characterized the Newtons' assertion of their rights under the SCRA as "flout[ing] the SCRA in an abusive manner."   Nothing could be further from the truth.  As the Plaintiffs' economic expert, Dr. Robert Cook, noted in his report and deposition, they had already repaid over $900,000 in principal and interest on the loan before the Bank foreclosed on the hardware store. On appeal in *Franklin Society*, the Court of Appeals of New York affirmed the grant of summary judgment in favor of the mortgagee and the denial of a stay in the proceedings "on the ground that the defendant failed to show that he had a defense to the action and that because no personal judgment was sought the mortgagor was not entitled to a stay of the proceedings . . . " *Franklin Society for Home-Building & Savings v. Flavin,* 291 N.Y. 530, 50 N.E. 2d 653 (1943). In this case, the Newtons have alleged defenses to the foreclosure actions and seek to enforce their rights under the SCRA for suspension of the payment obligation as provided in 50 U.S.C. App. §591.

The other case cited by Defendants in Section II.A. of Document 34, *Creamer v.*

*Censoplano*, 183 Misc. 716, 52 N.Y.S. 2d 862 (1945), was a foreclosure action in which two servicemembers sought a stay of the proceedings in a mortgage foreclosure action for which they had no defense.  The court denied the stay request on the basis that the default in the mortgage by one of the defendants had occurred *two years and ten months* prior to one of the mortgagor's induction into the armed forces and *four years and nine months* prior to the other mortgagor's entry on active duty.  Moreover, the defendants had failed to pay any interest that accrued after the default and had not paid the land taxes and water taxes since 1941.   There is no similarity between the Censoplano brothers and their non-payment of their mortgage obligation for years before they were drafted in World War II and the alleged default of the Newtons.  The Newtons made payments on the Edgehill Ace Note regularly throughout the life of that loan and made additional substantial payments on that obligation after Sharon Newton entered active duty.

The motion by the Bank to avoid liability for the illegal foreclosures and the wrongful failure to lower the interest rate on the Edgehill Ace Note based on allegations that the SCRA does not apply because the debt was in default prior to Sharon Newton's active duty should be denied.

## I.      The Newtons' Assertion of Their Rights Under 50 U.S.C. App. §591 Is Both Timely and Appropriate.

In the final point raised in the Bank's memorandum in support of its motion for summary judgment (Document 34, p. 28), the Bank characterizes the Plaintiffs' assertion of rights guaranteed to them by federal law as "incredulous" and an "eleventh-hour request to improperly stay <u>payments</u>", and then proceeds to mistakenly interpret 50 U.S.C. App. §591.  It is not Plaintiff or their counsel who have misread Section 591, it is the Bank and its counsel.

A stay of the mortgagee's right to enforce the mortgage during the period of active duty

and for a period thereafter equal to the period of active is authorized by 50 U.S.C. App. §591. Presumably, an attempt to enforce the obligation would result from a failure of payment by the mortgagor. Therefore, if the enforcement of the obligation is stayed, it appears that the mortgagor could safely decline to make payments during the period a moratorium on enforcement was in effect. The title of Section 591 of the SCRA is "Anticipatory Relief". Relief from a mortgage obligation comes only in the form of a moratorium in the obligation to make periodic payments on the mortgage.

Congress provided in Section 591 that the application for relief from enforcement of a mortgage obligation (which would provide the servicemember with a payment moratorium) could be made at any time during active duty or within 180 days after release from active duty. All parties to this litigation have agreed that Captain Sharon C. Newton is still on active duty with the U.S. Navy and will be on active duty orders until May 9, 2012. Therefore, when this action for relief under Section 591 was filed on July 28, 2011, Sharon C. Newton was on active duty and therefore well within her rights to seek relief under the SCRA. For the Bank to harshly criticize the exercise of a right granted by Congress at a point in time more than a year before the Plaintiffs were required to exercise the right is merely one more example of the lack of familiarity the Bank has with the SCRA and its steadfast refusal to grant to Plaintiffs their rights under the Act.

The "combined period" to which counsel makes reference (50 U.S.C. App. §591(b)(1)(B)(ii)) refers to the period *after* the expiration of the stay has expired. During the period following the expiration of the enforcement moratorium when payments resume, the debtor will be required to make both the regular payments on the loan *and* the additional payment over and above the regular monthly payment that must be made to repay the deferred payments.

When payments resume, the deferred payments will have been capitalized and a monthly amount can be calculated by dividing the total amount of deferred payments by the months remaining on the obligation.  The resultant amount is then *added to* the regular payment, and both payments must be made.

The term "combined period" means the remaining period on the loan during which *both* a regular payment *and* an additional payment amount (from the capitalized deferred payments that accrued during the payment moratorium) are combined together and will be made.  Any other reading of Section 591 makes no sense whatsoever, because it is the purpose of the section to provide financial relief for the servicemember during the period of military service and for an additional period after the period of military service.  Obviously, Congress intended to give the servicemember an opportunity to recover financially after the period of military service had ended.        The entire concept behind Section 591 is to give a servicemember-debtor relief from their pre-service financial obligations during the period of time authorized by the SCRA.  Because Sharon Newton's period of active duty was a lengthy one (83 months ending in May 2012) and because the obligation to the Bank was secured by a mortgage on real estate, the period of relief that can be granted is the period of her active duty plus a period equal to her period of active duty.  At the end of that period, the Bank will be entitled to payment of two amounts: the regular payment due on the Edgehill Ace Note at the contract rate of interest *and* a payment equal to the capitalized amount of the deferred payments that will have accrued during the moratorium period, amortized over the remaining life of the loan.  The period during which both of those payments will be due is what is referred to in Section 591 as the "combined period".

What is clear from reading  *Morris Plan Industrial Bank of New York v. Petluck*, 187

Misc. 87, 60 N.Y.S. 2d 162 (1946) is that in the timely post-service application for relief under 50

U.S.C. App. §590 (the predecessor statute to the current 50 U.S.C. App. §591) filed by the wife of

a disabled Navy veteran, the applicant had proposed some form of payment at less than required

by the mortgage during the 34 month period during which the veteran was entitled to relief.  The

court merely approved the requested repayment plan.  There is nothing in that opinion to suggest

that if a complete moratorium in payments had been requested, it would not have been granted.

The court merely approved the request that it had before it.

In *New York Life Ins. Co. v. Litke*, 181 Misc. 32, 45 N.Y.S.2d 576 (1943), the court had

initially stayed enforcement of the mortgage, but conditioned the stay on the defendant paying

$5.00 per month toward the real estate taxes on the property.  Thereafter, the mortgagee sought a

termination of the stay and the veteran sought protection under SSCRA Section 590.  The New

York court found the post-service application for relief to be *res nova* but recognized that was

what Congress meant to protect by the enactment in 1942 of Section 590:

> "The court's research has disclosed, however, no decision concerning the serviceman who
> has been returned to civilian life.  Such is the situation presented here, and such is the case
> which Congress had in mind when it added Section 700 to the Soldiers' and Sailors' Civil
> Relief Act Amendments of 1942.  Amended 56 Stat. 769, effective October 6, 1942, 50
> U.S.C.A. Appendix, §513 et seq.  Its purpose, as stated by the report of the Committee on
> Military Affairs on the amendments of October 6, 1942 (House Report No. 2198, 77th
> Congress, 2nd Session, p. 6, §18) is to grant persons in military service "relief for a
> specified period after military service in order to enable them to liquidate their liabilities
> in an orderly fashion and not be subject to the accrual and payment of these liabilities all
> at one time.
>
> "This section, as well as the other provisions of the Act, must be construed
> liberally in order to accomplish the broad objectives of Congress. . . . .
>
> . . . .
> "The provisions of the statute are elastic and no hard and fast rules are prescribed.
> Each case must be determined upon its own merits and relief granted within the broad
> directions of Congress in accordance with the necessities of the particular situation.  The

court is vested . . . with a wide discretion in providing for an installment liquidation of the ex-serviceman's debts 'subject to such other terms as may be just.' Section 700, subdivision 1(a) and (b)."

*Id.* at 579-80.  The court in *Litke* then went on to prescribe that the foreclosure action should be

discontinued on condition that the ex-serviceman pay certain out of pocket costs ($54.70)

immediately and that *payments* – which had been *suspended* in April 1943 – resume with the

payment due December 1, 1943.

With respect, the Plaintiffs' application for relief under 50 U.S.C. App. §591 is both

timely and appropriate under the circumstances.  Whether or to what extent such relief is granted

is a question for the jury and not an issue to be dismissed on motion of the Bank for summary

judgment.

## IV.
## CONCLUSION

This entire dispute arose because the Bank followed bad advice from the SBA.  The

Edgehill Ace Note, because it was personally guaranteed by two people who thereafter became

protected by the SCRA, was protected by the SCRA from June 2005 onward.  The ultimate

reversal of position by the Bank that resulted in a credit for all interest charged above 6% came

after all the damage (in the form of foreclosures) had been done.  Arguing that credit for the over-

charged interest has made the Plaintiffs whole is the rough equivalent of the bank robber offering

to hand over the stolen money after he has been arrested by the police following a high speed

chase.  The Plaintiffs are entitled to their day in court before a jury and the Bank's efforts to

dismiss this action on summary judgment should be rejected.

None of the issues raised by the Bank in its motion for summary judgment are free from

factual dispute or appropriate for summary judgment.  For the reasons set forth above, Plaintiffs

respectfully urge the Court to deny the Defendants' motion for summary judgment on each of the grounds urged.

<div style="margin-left:40%">

Respectfully submitted,

RAWLS, MCNELIS & MITCHELL, P.C.

BY:     /s/ Edward J. McNelis, III
     Edward J. McNelis, III, Bar No. 34003
     1111 East Main Street, Suite 1701
     Richmond, VA 23219
     Phone (804) 344-0038; Fax (804) 782-0133
     Emcnelis@RawlsMcNelis.com

JONES & ODOM, L.L.P.

By:     /s/ John S. Odom, Jr.
     John S. Odom, Jr., LA Bar No. 10163
     2124 Fairfield Avenue
     Shreveport, LA 71104
     Phone: (318) 221-1600; Fax (318) 425-1256
     john.odom@jodplaw.com

COUNSEL FOR PLAINTIFFS

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically transmitted the foregoing Memorandum in Opposition by Plaintiffs and Counter-Claim Defendants, Burl I. Newton and Sharon C. Newton to Defendants' Motion for Summary judgment using the CM/ECF System for filing and transmitted a Notice of Electronic Filing to the following counsel of record:

    Michael D. Mueller
    Belinda D. Jones
    Christian & Barton, L.L.P.
    909 East Main Street, Suite 1200
    Richmond, Virginia 23219-3095

<div style="text-align:center">-30-</div>

April 20, 2012.

_____/s/ Edward J. McNelis, III_____
EDWARD J. McNELIS, III