UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| BURL I. NEWTON and SHARON C. NEWTON<br>    Plaintiffs | :<br>:<br>:<br>: |
| VERSUS | :    CIVIL ACTION NO. 3:11-cv-493 |
| BANK OF MCKENNEY and WILLIAM D. ALLEN, III<br>    Defendants | :<br>:<br>: |

### DECLARATION OF BURL I. NEWTON

I, BURL I. NEWTON, declare under penalty of perjury that the following is true and correct. Moreover, I make these declarations on personal knowledge of the facts declared herein, state that each document referred to in this Declaration has been produced by the defendant, Bank of McKenney ("Bank"), and is therefore presumed by me to be admissible in evidence in this matter and state that I am competent to testify on the matters stated in this Declaration. This Declaration is submitted in support of our Motion for Partial Summary Judgment (Doc. 31) and also in support of our Memorandum in Opposition to the Bank's Motion for Summary Judgment (Doc. 33). The exhibit numbers used as references in this Declaration correspond to those used in Documents 32-1 and 32-2 and our counsel's Memorandum in Opposition to the Bank's Motion for Summary Judgment, plus the exhibits submitted with that Opposition Memorandum.

1. I am the husband of Sharon C. Newton, currently a Captain in the U.S. Navy, on active duty orders since June 2005. My wife is currently scheduled to be released from active duty on May 9, 2012, but thereafter she will still be a member of the U.S. Naval Reserve and subject to re-mobilization.


EXHIBIT 34

2. When my wife and I decided to open a hardware store following my retirement from a career in the U.S. Navy, we decided to own the real estate for the store in one company and the inventory and accounts of the store in another entity. In 1998 we formed B&S Commercial Properties, LC ("B&S") to own the real estate on which the hardware store would be located and purchased a former grocery store building for that purpose. We also formed Edgehill Ace Hardware, Inc ("Edgehill Ace") as a separate corporation which would operate the store and own the accounts, inventory, fixtures and equipment in the store.

3. There were no owners of the membership interests in B&S other than Sharon C. Newton and me.

4. There were no shareholders of Edgehill Ace Hardware, Inc. other than Sharon C. Newton and me.

5. We financed the acquisition of the hardware store building in the name of B&S and borrowed those funds from the Bank of McKenney ("Bank") in 1998. The collateral for the loan was the hardware store land and building and the 92.2 acre farm property in Dinwiddie County, Virginia.

6. I had purchased two pieces of farm property (92.2 acres, bearing municipal number 20902 Courthouse Road, Dinwiddie, Virginia and 118 acres, bearing municipal number 20703 Courthouse Road, Dinwiddie, Virginia) before Sharon Newton and I married in 1996. However, all of the payments on both pieces of property throughout our marriage have been made from community funds and the monthly payments owed to Farm Credit have been paid on both pieces of property from the bank account of Sharon Newton for the duration of our marriage. I

consider those properties to be as much hers as they are mine, regardless of whose name is on the deeds. Additionally, Sharon Newton is a personally liable as a signatory on the Farm Credit promissory note by which those properties were financed.

7. I have carefully read the Declaration of Sharon C. Newton previously filed in this matter as Document 32-1, pp. 1 - 20, and I adopt and concur in all the statements made therein.

8. When Sharon and I borrowed the funds from the Bank for Edgehill Ace Hardware, Inc. on July 6, 1998, both the Bank and the SBA required us to personally guarantee the debt of Edgehill Ace Hardware, Inc. It was made clear that the loan would not have been made unless Sharon and I personally guaranteed all the debt of Edgehill Ace Hardware, Inc. and executed a deed of trust mortgaging the hardware store real estate, and our home and farm properties as additional collateral for the loan to Edgehill Ace Hardware, Inc. The loan number on the $700,000 promissory note we signed and the loan number on the SBA Guaranty she and I were required to sign are precisely the same loan number. The SBA Guaranty refers to Sharon and me as the "Debtor" on SBA Loan No. GP-211, 714-40-05-Rich, and we consider ourselves to be personally liable on that promissory note as though each of us had signed it individually. The Bank considers us liable for that debt as well. *See* Document 32-1, p. 64 of 76 and 67 of 76.

9. Our hardware store business was severely and materially affected by Sharon's call to active duty. When she was mobilized to active duty, Edgehill Ace Hardware

had four employees, two of whom were Sharon and me. Neither of us drew any salary. When she was mobilized to active duty, we were no longer in the same community and could no longer work at the store. I had to hire staff to replace her and that resulted in significant additional operational costs for the store. Specifically, once Sharon had left for active duty, she was no longer available to work in the store on Saturdays and Sundays, which she had done before her call to active duty. I had to hire replacement staff to cover her unavailability, reduce hours of operation on Saturdays and start closing completely on Sundays. All of those factors decreased sales and increased the costs of operations of the store, thus materially affecting our ability to pay the Edgehill Ace Note at the contract rate of interest.

10. Sharon's mobilization in June 2005 could not have come at a worse time for Edgehill Ace Hardware. While she and I were both available to work at the store, she handled payroll and accounting, reconciled multiple bank account statements, filed the required monthly financial statements, handled janitorial duties as needed, acted as a cashier at times, handled customer service, stocked the shelves, placed orders for new merchandise and, in short, accomplished whatever tasks I directed. She was involved in virtually all aspects of the business, and the hardware store enjoyed her labors without salary. Even though Sharon was working as a nurse practitioner during the day, we worked nights and weekends at the store. Additionally, when she was living at home we could discuss hardware store operations and plans during the evenings and weekends. Even though we had access to telephone communication while she was gone, a telephone

conversation is simply not the same thing as sitting at the dining room table going over sales figures, making plans for future sales promotions, evaluating employees, deciding what inventory to order for upcoming seasons and all the other details involved with running a family business. When one of the owners of a "mom and pop" hardware store is gone – regardless of the reason – things just do not run as smoothly and the operations of the business are materially affected by the absence.

11. When Sharon left for active military duty in June 2005, I had to hire and pay employees to replace all the things Sharon had done.

12. The additional expenses caused after Sharon left for active duty were significant, not only for the hardware store but also for us personally. Not only were we then having to support two separate households with all the associated additional costs involved in lodging, food and other daily expenses, she also incurred significant travel and living expenses which were not reimbursed by the Navy. From June 2005 when Sharon demanded that she receive the protections afforded her by the SCRA until the Bank sued us in state court on April 26, 2011, no one had ever challenged our entitlement to SCRA protection or claimed in any way that we were not materially affected by Sharon's call to active duty. As a result, we did not bother to keep detailed records of the additional expenses we encountered as a result of her active duty and absence from the family home for nearly seven years. At this late date, it would be impossible for us to document all the additional living, travel and work expenses we incurred as a result of her military service.

13. Even though Edgehill Ace Hardware was struggling to make a profit, we were paying our bills, paying our employees and servicing the debt we owed the Bank. From the time we borrowed the funds from the Bank in 1998 until when the store had to be closed in 2006, we paid the Bank nearly $900,000 in principal and interest. The Bank did not advance any additional funds to Edgehill Ace Hardware or B&S after 2001. We were steadily and significantly reducing the outstanding principal balances on both the loan to B&S and Edgehill Ace Hardware, which was a remarkable feat during a business downturn, a bad economy and economic uncertainty following the September 11, 2001 attacks on the country.

14. After Sharon departed for active duty, I encountered significant health issues that led to open-heart surgery in May 2006. I am a combat veteran of Desert Shield/Desert Storm and my health issues are all either caused by or were aggravated by my many years of military service. Sharon's absence from home and the hardware store, the downturn in the economy, my health issues and the Bank's unwillingness to restructure the Edgehill Ace Hardware debt repayment plan to offset the decrease we knew we were going to suffer in personal income (from the loss of Sharon's opportunity for personal bonuses in her nurse practitioner services in Virginia and the anticipated additional living expenses she was going to incur supporting an additional household wherever she was stationed), as well as the need for the hardware store to acquire additional spring and summer inventory all combined in a "perfect storm" to doom Edgehill Ace Hardware.

15. Even after the store was closed, if the Bank had allowed for an orderly liquidation of the real estate and the inventory, or allowed me to lease the store to another operator, the situation could have either been saved, or the amount still owed to the Bank would have been greatly diminished. Once the Bank published the nonjudicial foreclosure notice on June 26, 2006, any chance that we could realize top dollar for the store property or even lease it vaporized. No one was going to purchase it on an arm's length deal knowing that if they just held out awhile longer, they could bid on it in a nonjudicial foreclosure liquidation auction.

16. During the time the Edgehill Ace Hardware was in operation, Sharon and I advanced approximately $175,000 for the store's operations from our own personal funds. Once the Bank foreclosed upon both the building and the store's inventory, obviously we were completely out of business and had no possibility of recovering any of those funds. I consider the loss of those loaned funds to be an element of the damages for which we are suing the Bank.

17. Even after Sharon was called to active duty in June 2005, we continued making payments on the $700,000 loan the Bank had made to Edgehill Ace Hardware in 1998. Payments were made on that loan up through November 2005. *See* Exhibit 35 filed in connection with our Memorandum in Opposition to the Bank's Motion for Summary Judgment.

18. The document entitled Agreement of Modification dated August 29, 2005 (Doc. 32-2, p. 5 of 83) was something the Bank insisted on us signing. Neither Sharon nor I intended in any way to be waiving any of our rights under the SCRA. No new funds were advanced when that document was executed. SBA policy

7

allowed for interest-only payments for a period of time for mobilized Reservists who had SBA loans and Sharon had applied for that benefit. The Bank merely wanted some record of the fact that it was allowing interest-only payments on the Edgehill Ace Note for the period the SBA policy allowed. The interest rate on the loan was supposed to be lowered to 6% in accordance with the SCRA, and Sharon had made demand for that benefit as well. The SBA had no control over whether or not to lower the interest rate since Congress had granted that right to Sharon and me on the pre-service loans.

19. The Bank initiated nonjudicial foreclosure proceedings on the real estate where the Edgehill Ace Hardware was located by publishing in *The Monitor*, an area newspaper, a notice of their intent to sell the property at nonjudicial sale on June 21, 2006. Once that publication occurred, my chances of selling the real estate at fair market value to pay off the loan to B&S Commercial Properties, LC ("B&S") were greatly diminished. Any prospective buyer, knowing the Bank was foreclosing, would simply wait to purchase the property at the nonjudicial foreclosure sale. As a result, we lost several hundred thousand dollars in equity when the Bank ultimately sold the property for significantly less than its appraised value. I consider that loss as a portion of the damages to which we are entitled from the Bank.

20. When the Bank foreclosed against the B&S real estate, the B&S loan was not in default. The Bank used the cross-collateralization from the deed of trust it had insisted upon in 1998 when the Edgehill Ace Note was executed to foreclose against the B&S real estate. The Bank then paid off the B&S loan 100 cents on

the dollar before crediting any of the proceeds of that foreclosure to the Edgehill Ace Note balance.

21. The Bank never initiated any court action to foreclose on the B&S real estate. I filed the Chapter 11 proceeding for B&S the day before the property was to be sold as the only way of stopping the Bank's illegal efforts to nonjudicially foreclose on the real estate. Neither Sharon nor I concurred in the filing of the Consent Order in the bankruptcy and specifically reserved our rights to sue for violations of the SCRA resulting from the Bank's actions.

22. Edgehill Ace Hardware, Inc. was not a party to the B&S Chapter 11 proceeding. The Bank never sought or obtained any court order, as required by the SCRA, before proceeding with the nonjudicial foreclosure, seizure and sale of the inventory of Edgehill Ace Hardware, Inc. on May 23, 2007. Some of our personal property was on the grounds of the hardware building when that auction took place and we did not give permission for any of it to be sold.

23. We have had to hire and pay attorneys to fight the Bank at virtually every step since 2006. The funds we have expended on attorneys have all come from our own savings and personal assets.

24. After the foreclosures and the demise of the hardware business, Sharon and I were left with no way to generate cash flow to pay the Bank the outstanding balance on the Edgehill Ace Note. The B&S loan had been completely paid off from the foreclosure proceeds.

25. After the foreclosure, I requested from Kimberly Swain an accounting of what had been credited on our loans and what the Bank claimed it was still owed. I

discovered from her letter of September 15, 2010 (Document 32-2, p. 35 of 83) that among other charges the Bank was trying to collect from Sharon and me, they were charging us with all the attorneys fees the Bank had incurred for responding to third parties concerning complaints I had lodged with the SBA, the White House, the Federal Reserve Bank of Richmond, Senator Warner's office, the U.S. Attorney's office and others. I complained to those parties because our SCRA rights were being repeatedly violated. I was outraged when I read that the Bank was attempting to recover from Sharon and me their attorneys fees for writing responses to the agencies to whom I had complained about *their* violations of the SCRA. When both the SBA and the Bank finally admitted in 2010 that the Edgehill Ace Note should have been accorded SCRA protection all along, rather than feeling vindicated that my efforts had been successful, Sharon and I were both embarrassed, humiliated, disgusted and emotionally drained to realize that we had been right all along but still, the hardware business was gone as a result of the 2007 foreclosures and Sharon and I were left with no way to pay the balance the Bank was claiming we owed out of sales revenues from a business that no longer existed.

26. It is difficult for me to put into words how much all of this upset Sharon and me. While she was serving her country at great personal sacrifice and expense, the Bank violated federal law and ultimately took our business. We were both embarrassed, humiliated, horrified, outraged, emotional distressed and angry over the injustice of a creditor who violated federal law (the SCRA) first illegally taking our business and then sending us dun letters month after month after month

when the Bank knew full well that we had no way to generate cash flow from the business they had illegally taken.

27. As if the horrors we endured from the Bank's actions in 2007 have not been enough, in May 2011, while Sharon was stationed in San Diego and I was in the process of moving there where I had to undergo several major neck surgeries, the Bank initiated a suit in state court in Dinwiddie County, Virginia, seeking judicial authority to seize our home in Colonial Heights and our two farm properties. We have had to hire and pay attorneys to fight the Bank first in state court and now in this federal court action at significant expense to us. The same emotional outrage, embarrassment, humiliation, emotional distress and mental anguish that we felt over the Bank taking our hardware business in 2007 we feel now – only greatly magnified – as we see the Bank attempting to take our home and farm.

I declare under penalty of perjury that the foregoing declaration is true and correct. Executed on April 20, 2012 at Colonial Heights, Virginia.

_____
BURL I. NEWTON