11ap12ex

1

```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                     Richmond Division

3      -------------------------------------------------------

4    BURL I. NEWTON
     and SHARON C. NEWTON,
5
                    Plaintiffs,
6
     v.                          Civil Action No.:  3:11CV493
7
     BANK OF MCKENNEY
8    and
     WILLIAM D. ALLEN, III,
9
                    Defendants.
10
     -------------------------------------------------------
11

12

13

14      TELEPHONIC DEPOSITION OF ROBERT W. COOK, JR., Ph.D.

15

16

17

18                      April 11, 2012

19               Shreveport, Louisiana
                   Richmond, Virginia
20

21

22

23              HALASZ REPORTING & VIDEO
                      P. O. Box 1644
24             Richmond, VA 23218-1644
                    (804) 708-0025
25          Reported by:  Mary L. Rosser, RPR
```

HALASZ REPORTING & VIDEO

Page 1



EXHIBIT

36

11ap12ex

[]

2

```
 1

 2              Telephonic deposition on oral examination of

 3    ROBERT W. COOK, JR., Ph.D., by and before Mary L. Rosser,

 4    a notary public in and for the Commonwealth of Virginia

 5    at large, pursuant to Rule 30 of the Federal Rules of

 6    Civil Procedure, and Notice to Take Depositions, lodged

 7    with the other papers in this action, commencing at

 8    1:39 p.m., April 11, 2012, at the law offices of Rawls &

 9    McNelis, 1111 East Main Street, 17th Floor, Richmond,

10    Virginia, and John S. Odom, Jr., by telephone.

11

12    APPEARANCES:

13         JONES & ODOM, LLP
           BY:   JOHN S. ODOM, JR., ESQ. (BY TELEPHONE)
14         attorney, co-counsel for the plaintiffs

15         RAWLS & McNELIS
           BY:   EDWARD J. McNELIS, III, ESQ.
16         attorney, co-counsel for the plaintiffs

17         CHRISTIAN & BARTON
           BY:   MICHAEL DAVID MUELLER, ESQ.
18             BELINDA JONES, ESQ.
           attorneys, of counsel for the defendants
19

20

21

22

23

24

25
```

11ap12ex

[]

3

```
 1                          INDEX
 2    WITNESS                                    PAGE
 3    ROBERT W. COOK, JR., Ph.D.
 4         Direct Examination by Ms. Jones        4
 5
 6
 7
 8
 9                        EXHIBITS
10    No.             Description               Page
11     1    Department of Defense, Decision, June 30,   29
            2009
12     2    Pro forma                           39
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1              ROBERT W. COOK, JR., Ph.D.
 2          was sworn and testified as follows:
 3                  DIRECT EXAMINATION
 4   BY MS. JONES:
 5       Q    Dr. Cook, I know we met off the record, but I'm
 6   Belinda Jones with the law firm of Christian & Barton,
 7   here today on behalf of Bank of McKenney and Mr. William
 8   Allen, the defendants and cross-claimants in this matter.
 9            If you will, state your name for the record,
10   please.
11       A    Robert Winston Cook, Jr.
12       Q    And, Dr. Cook, is your present business address
13   1 Gateway Road, University of Richmond, Richmond,
14   Virginia, 23173?
15       A    Yes, it is.
16       Q    And what is your current home address?
17       A    107 Franks Creek Circle, Hertford,
18   H-E-R-T-F-O-R-D, North Carolina, 27944.
19       Q    And are you presently employed, Dr. Cook, still
20   with the University of Richmond --
21       A    I am.
22       Q    -- Robins School of Business?
23       A    Excuse me.  I am.
24       Q    And what subjects are you currently teaching?
25       A    This semester I teach Global Economic Analysis.
```

□

13

1     A     Through probably the second quarter of 2011.  If

2     we were talking -- "relatively" means over the time

3     period.  If you look across that time period and you

4     wanted to separate out perhaps two time periods within

5     that one time period, you would say, well, up until about

6     2008, end of 2007, a reasonably normal and robust economy

7     in that area especially.  After then a downturn,

8     relatively severe downturn.  A modest recovery, not two

9     previous levels, but a modest recovery in 2011.

10    Q     Did you have an understanding from looking at

11    the documents pertaining specifically to Edgehill whether

12    or not the Edgehill Ace Hardware Store was relatively

13    robust from 1999 through its closing date of 2006?

14    A     They paid their bills, they paid their loans,

15    they paid their interest.  They didn't make any money.  I

16    think that's the best brief summary I can give you.

17    Q     We're going to, obviously, talk more about

18    Edgehill when we get into the details of your report.

19         The one thing that I didn't see in this stack,

20    Dr. Cook, are the tax returns for the Newtons

21    individually.  Did you review those?

22    A     No.  I was asked to -- well, as I said, I was

23    asked whether or not the business itself had any value to

24    them.  There's some entities in the business returns that

25    would certainly be reflected in the individual returns,

0

14

1    but I did not look at the individual returns.

2        Q    And going back through the documents that we've

3    identified as those documents that you reviewed in order

4    to draft your expert report in this matter, I think it's

5    safe to assume that you reviewed the answer and the

6    complaint; is that correct?

7        A    I did.  I read the complaint, and I read the

8    answer.

9        Q    Did you by chance read the Servicemembers' Civil

10   Relief Act?

11       A    No.  I gained an understanding of that Act

12   through my conversations with Mr. Odom.  As a matter of

13   fact, that was probably the introduction to our

14   conversation, part of his explanation of what he wanted

15   me to do.

16       Q    And do you intend to offer any opinion at the

17   trial of this matter on the Servicemembers' Civil Relief

18   Act and whether or not that Act was violated?

19       A    No.  That was -- it made the job difficult.  I

20   will say that.

21       Q    And just to sort of dissect that, your answer of

22   "no" is the answer to you do not intend to offer any

23   testimony as to the Act and whether or not it was

24   violated; is that correct?

25       A    No, I do not.  You know, whether or not --

11ap12ex
HALASZ REPORTING & VIDEO

15

1   violated in a legal sense I think is what you're asking

2   me.  No.  I have no opinion with regards to that.

3       Q    And do you have any opinion about the

4   allegations contained in the complaint and responded to

5   in the answer?

6       A    That's a hard question.  I mean, it made it

7   difficult because I read those first after my

8   conversation with Mr. Odom.  And Edgehill Hardware,

9   that's Main Street, not Wall Street, and I probably have

10  an opinion about Main Street versus Wall Street.  The

11  business was in trouble.  No question about that.  They

12  were not making money, and this was a person called to

13  active service in the military.

14          You know, I've been in the military, and

15  Mr. Odom explained to me that although I have no opinion

16  on whether or not this bill was violated, the intent of

17  this particular relief act was to help small business

18  persons, perhaps, people that needed help.  In other

19  words, if I were called to active duty, I probably would

20  need help.  So, sure, after I read the claim and the

21  answer to the claim, I wondered what's going on here.  I

22  mean, what's the bank doing foreclosing on a business,

23  you know, a Main Street business, persons receiving

24  relief from the Act.  Sure, I thought it wasn't all that.

25          So it made it hard.  I mean, at first blush,

11ap12ex
HALASZ REPORTING & VIDEO

0

16

1    probably like everybody else, I had a bad opinion of the

2    bank.  I had to set that aside.  It did make it hard.  I

3    will admit that.

4        Q    Well, and I --

5        A    Reading the claim and counterclaim, after I

6    finished reading just that, I had to be guarded about

7    what I did from then on.  I have to admit that.

8        Q    Well, and I certainly appreciate your honesty

9    about that, and what I want to get at is, as to your

10   retention as an expert in this matter, what your opinions

11   will be as set forth in your expert report and your

12   testimony at trial and whether or not you will be making

13   an opinion -- and we can take it one step at a time.  I

14   think you've already testified that you will not be

15   offering an opinion about the Act or any alleged

16   violation of the Act; is that correct?

17       A    I will not, and I will try very hard not to

18   offer any opinions, subjective opinions with regards

19   to -- well, what I just said.  I mean, I will try to keep

20   it as clean as I possibly can, just the numbers and

21   nothing else.

22       Q    And will you be offering an opinion as to

23   whether or not the Newtons required protection under the

24   Act?

25       A    Whether or not they required it?

                                                              17

1       Q    Well, and I --

2       A    They needed protection.  Now, whether or not

3   that protection should have or should not have been

4   provided by the Act, I can't say that, no.

5       Q    Okay.  And I want to dissect that a little

6   further.  When you say they needed protection -- and I

7   don't want to put words in your mouth, but I think you

8   mean because of what we've already talked about, which is

9   the business wasn't making any money.  Is that what you

10  mean when you say they needed protection?

11      A    No.  I mean because she was called to active

12  duty at a time, a very difficult time in the business.

13  That's what I mean.  There are many businesses that don't

14  make money that don't have to overcome that particular

15  difficulty.  So I guess it would be the juxtaposition of

16  the two.  Certainly, if that had been perhaps -- and,

17  again, I don't know the law, but if that had been a very,

18  very profitable business and Mrs. Newton had been called

19  to active duty, perhaps the Act is not designed to

20  provide assistance.  So it would be the two things I

21  think together that would apply to me that these were

22  persons -- this was a business in need of whatever

23  protection the Act might afford.

24      Q    And I know that you testified that you didn't

25  speak directly to Captain Newton.  Did you, when you

0

33

1    Q    Okay. So let me ask this question first and

2    maybe we can get about it this way: Removing any

3    protections that may have been afforded by the Act,

4    removing the fact that Captain Newton is a servicemember,

5    is the analysis on how the business would have done and

6    the Newtons' lost investment in that business the same?

7    A    You mean had they just gone on the way they were

8    before? Whether she was in or out, she wasn't called,

9    they didn't need the relief, just had they gone on the

10    way they were before?

11    Q    Right. If she was not a servicemember.

12    A    That's the idea. I mean, I looked at what

13    happened in 2005. She had not been called to duty so

14    whether or not she was or was not a servicemember doesn't

15    make any difference; she hadn't been called.

16    Q    Right.

17    A    And I said based upon this performance, what

18    would have happened post 2005. Well, I said that the

19    best they could have hoped for is to get their money

20    back. But, of course, she was a member, she did get

21    called, and none of that happened; they didn't get their

22    money back, they were foreclosed on. So that's right.

23    That's the way I framed it. It didn't make any

24    difference if she was a servicemember or not. Up until

25    2005, she hadn't been called.

0

34

1     Q    Okay.  So now I think, now I think I'm

2    understanding the assumptions that you made going in.

3    And the $174,000, $174,495, that's their lost investment

4    in your opinion, Dr. Cook; is that correct?  And feel

5    free --

6    A    No, they lost more than that, but that is the

7    best -- that's all I thought that they had a possibility

8    of recouping.  They've lost money over the time period.

9    So the business has lost more than the $174,000, but I

10    didn't see any way they were going to get that back.

11    Q    And tell me precisely how you were able to

12    determine that they were -- and I don't want to put words

13    in your mouth.  I think I'm using your words, but the

14    $174,495 is the best they could have ever done?  I'm

15    trying to use the words you just used, and if I'm using

16    different words, I don't intend to.

17    A    I understand.  I mean, and it goes sort of back

18    to our initial conversation.  They started this business,

19    and the value to the business that they anticipated was

20    they'd make money, they'd put money in their pocket, but

21    they didn't do that.  The large portion of the money went

22    to pay for the cost of goods sold, the things they bought

23    to sell -- it normally is -- and the next thing was the

24    interest payments and the principal payments they made

25    during that period.  That's where the money went.  And in

0

35

1    addition to that, they loaned the business approximately

2    $175,000.  So what I said was, had they gained the relief

3    that they may or may not have been due and continued to

4    operate that business with the relief, they wouldn't have

5    made money, they wouldn't have gotten that -- they would

6    not have received whatever it was, a couple hundred

7    thousand dollars they lost from the business, but based

8    upon what I saw, their track record, they could have

9    gotten their $175,000 out.  That's all.  That doesn't

10   mean everybody else would have been paid.

11       Q    Well, and I want to talk about that, too, but

12   I'm still trying to get this sort of basic overall

13   opinion about this -- and I'm going to call it $175,000,

14   but we'll both understand that that's $174,495.  Is that

15   okay?

16       A    Yes, ma'am.

17       Q    I think what you have told me is, you looked at

18   how the business was performing up until her call to

19   active service and continued to assume that it would have

20   been performed on that same track had she not been called

21   to active service; is that correct?

22       A    With one exception.

23       Q    Yes, sir.

24       A    She would have gained the relief.  That's the

25   only exception.

D

36

1    Q   That's going to be my second part.  And then the
2   assumption that you made is that from the time that she
3   was called to active service, from some period of time
4   thereafter, certainly while she remained in active
5   service and some period of time thereafter, she would
6   have had no obligation to make payments to the bank.
7   That's the assumption that you made.

8    A   Yes.  That's my understanding.  That's the form
9   of relief we're talking about.

10    Q   Yes, sir.  And, of course, if she had no
11   obligation to make payments to the bank, your assumption
12   is the bank wouldn't have foreclosed?

13    A   That's right.  The difficulties we read about
14   had she received the relief, those difficulties would
15   have been mitigated.  They weren't.  They were
16   foreclosed, and they lost.

17    Q   Right.  And if the bank had not foreclosed, they
18   would have operated the business and, in your opinion,
19   the best they could have hoped for would be to pay
20   themselves back their loan of $175,000?

21    A   That's the best they could have hoped for.

22    Q   While we're talking about documents, Dr. Cook,
23   that you relied upon, will you take a look with me in
24   your expert report at the very last page, which is Bates
25   labeled 877.  Oh, I'm sorry, this report.  I'm sorry.

Ꭰ

37

```
 1    This has all the attachments to it.

 2        A    Thank you.

 3        Q    Sure.

 4        A    I'm looking at it.

 5        Q    Did you review this document along with the

 6    other documents that we've identified?

 7        A    Yes.  I saw this document.  This was something

 8    that I think -- I saw it because I remember the "old

 9    Blue" part.  This is something that I believe Mr. Newton

10    sent to Mr. Odom.

11        Q    And my question to you, Dr. Cook, is, you see

12    his -- and I understand this is Mr. Newton's e-mail to

13    Mr. Odom --

14        A    Yes.

15        Q    -- it is not to you, but it says, Below is the

16    requested, plus addition -- I think he meant

17    additional -- information you did not request.  And my

18    question to you, Dr. Cook, is whether -- and I'll give

19    you a second to review it -- whether any of the

20    information provided in this e-mail was requested by you

21    for your analysis?

22        A    No.

23        Q    And look with me, if you will, at the tenth

24    bullet point down.  I'm testing you today, aren't I?  I'm

25    sorry.
```

[]

38

1      A    I have it.  I have the Edgehill market
2    assessment.
3      Q    Yes, sir.  And is that the document that you
4    showed me earlier when you were going through them that
5    we called the pro forma?
6      A    I don't know.  I read this as assessment of the
7    building that the -- the real property of the building.
8    I don't know if it's the same thing.
9      Q    And just to make sure we're looking at the same
10   bullet point, we're talking about the Edgehill market
11   assessment conducted by Ace Hardware?
12     A    Yes.  That one that I gave you I believe was
13   done by Longwood University --
14     Q    Okay.
15     A    -- not Ace Hardware.  Now, Longwood may have
16   done it on behalf of Ace Hardware, I don't know, but I
17   don't think that's the same thing.
18     Q    You don't.  And do you recall seeing an
19   assessment done by Ace Hardware?
20     A    I do not, but we may look through the documents
21   and see if -- do you have the pro forma?
22     Q    I think it's still in that pile.
23     A    The one I saw was prepared by Longwood
24   University.  This is the only pro forma document that I
25   looked at.

Page 38

11ap12ex
HALASZ REPORTING & VIDEO

0

39

```
 1      Q     And is this -- and we'll mark this as Cook 2 --
 2   is this the only pro forma document that you relied
 3   upon?
 4      A     It's the only one I've seen --
 5      Q     Yes, sir.
 6      A     -- yes.
 7            MS. JONES:  Let's go ahead and mark that as
 8   Cook 2 just so we know what to identify it as.
 9                     (Cook Exhibit No. 2 was
10                      marked for identification.)
11
12            MR. MCNELIS:  Excuse me just a moment.  I have
13   to grab a cord for this.
14            MS. JONES:  Oh, absolutely.  Do you want us
15   to --
16            MR. MCNELIS:  John, I'm going to step out just a
17   second and grab a cord.  Are you okay for 30 seconds
18   while I walk down the hallway?
19            MR. ODOM:  Sure.
20   BY MS. JONES:
21      Q     And, Dr. Cook, besides the opinion that we've
22   established -- and I want to make sure I say it correctly
23   and you agree with how I'm saying it because then that
24   means that I've understood it -- that evaluating the
25   business up until the time that Mrs. Newton was called to
```

Page 39

[]

40

1    active service and assuming that the business operated

2    consistently after her call to active service, in

3    addition to assuming that the Newtons were afforded

4    relief under the Act which would have allowed them to not

5    make any payments to the bank during the period of her

6    active service and sometime thereafter, the best the

7    Newtons would have been able to do with Edgehill Ace

8    Hardware is to pay themselves back approximately $175,000

9    of money they had loaned to the business?

10       A    That's correct.  The best they could have done

11   is recovered what they put in.

12       Q    And besides ---

13       A    Not make any money.

14       Q    Yes, sir.  And besides for that opinion, which

15   I'm glad I stated correctly because that means I now

16   understand it, are there any other opinions that you

17   intend to offer at the trial of this matter?

18       A    No.  That's what I was asked to do.  Well, I was

19   asked a broader question as I stated earlier, did the

20   business --

21       Q    Have any value.

22       A    -- was it worth anything to them or did it have

23   any value, and I said, as you just stated, had they

24   received the relief, the value they may have enjoyed from

25   this business was getting their money back.  Well, I said

Page 40

0

41

1    more than that.

2        Q    Well, and we're going to --

3        A    I did say that that value was destroyed by the

4    foreclosure.  So that was a statement that I made in the

5    report also, but that was the only value that could have

6    been --

7        Q    And your statement as to the value being -- and

8    we're going to go through your report, but your statement

9    as to the value -- well, let's use your statement in your

10   report.  How's that?  I think the statement that you're

11   referring to, Dr. Cook, and you tell me if I'm wrong, is

12   in the paragraph that -- the beginning of the paragraph

13   is on the bottom of page 3 and it continues to the top of

14   page 4 of your report, and I believe the statement you're

15   thinking of is the last sentence of that paragraph, which

16   is found on the top of page 4.  And that Bates number for

17   the record is 842.

18       A    At the top of page --

19       Q    4.

20       A    -- 4 of my report?

21       Q    Yes, sir.  It starts with -- and I'm using the

22   report that Mr. Odom produced to me so yours may be --

23   and specifically 842.

24       A    I'm looking at it.  Thank you.

25       Q    Yes, sir.

0

42

1     A     And the question is?

2     Q     Well, you had just said -- and I made the

3     statement about how the bank's foreclosure, I think you

4     said, destroyed those assets or something along those

5     lines, and my point was, let's find the statement that

6     you made in your report.  Is that the statement that you

7     were referring to?

8     A     That is correct.  The seizure of the assets

9     foreclosed any option they had to recover that asset.

10    It's gone.  They took it.

11    Q     And that statement is based upon the assumption

12    that the foreclosure was unlawful?

13    A     No.  It took place.  I mean, once they took the

14    assets, obviously, the Newtons were not going to get

15    those assets.  They were gone.

16    Q     Well, and I just want to make sure we're on the

17    same page with this because it's my understanding, and I

18    think you agree, that your projection of what the Newtons

19    would have been paid back assumed that the foreclosure

20    never happened because the Newtons were given every

21    protection that you understood they were entitled to

22    under the Act; is that correct?

23          MR. ODOM:  Object to the form of the question.

24    I'm not sure you stated those facts correctly, Ms. Jones.

25          MS. JONES:  Can you read my question back?  I'm

〔

43

1    sorry.

2         (The question was read by the court reporter.)

3

4    BY MS. JONES:

5         Q    Dr. Cook, you can answer unless someone --

6         A    Well, the answer is yes.  It assumes that the

7    foreclosure took place, and had it not taken place, then

8    they would have had an opportunity to recover that asset,

9    nothing else.  Obviously, I mean, just by definition it

10   could not have taken place for them to recover the

11   asset.

12        Q    And I think we're saying the same things,

13   although we're saying them differently and I'm sure I'm

14   the one who's sort of botching this up, but let me ask

15   the question this way:  If Captain Newton was not in the

16   military and the bank had foreclosed because the notes

17   were in default, would it still be your opinion that the

18   Newtons lost investment as you've classified it in your

19   report as $175,000?

20        A    Well, sure, they would have lost that.  It

21   wouldn't make any difference why they foreclosed.  They

22   would have lost that.  What I was -- my thought process

23   is, had they been afforded protection, that foreclosure

24   would not have taken place, but, certainly, no matter why

25   it took place, once it took place they lost that.

[]

44

1      Q      And my question was framed poorly, and I'll ask

2    it again.  If Captain Newton had not been called to

3    active duty -- strike that.  I'm trying to get our record

4    to be clear because we've been so conversational.

5            Your assumption is that if the protections

6    afforded under the Act had been provided to the Newtons,

7    they would have continued to operate the business, it

8    would not have been foreclosed upon, and they would have

9    paid themselves back $175,000?

10     A      That's correct.  The business would not have

11   been foreclosed upon.  The difficulty would not have

12   arisen, all of the difficulties that we've talked

13   about.

14     Q      And explain to me, if you can, Dr. Cook, all of

15   the ways in which the Newtons would have been able to

16   recover their investment had the business not closed.

17     A      They would have done it through cash flow just

18   as they did it from '98 through 2005.  We would just have

19   to go through the lines on the operating statement and

20   the balance sheet to do it in detail.

21     Q      And when you say they would have done it through

22   cash flow, what you mean is, they would have continued to

23   strengthen their balance sheet while repaying their

24   debt?

25     A      Well, they may not have strengthened their

☐

45

1    balance sheet.  I mean, just because they got their money

2    back doesn't necessarily mean that that balance sheet

3    would be stronger.  It simply means that they had repaid

4    their own loans.  There could be other obligations on the

5    balance sheet.

6        Q    And that's --

7        A    That's the point.  I mean, I didn't say this

8    business was going to return an investment to them over

9    and above anything they put in it.  I mean, there are

10    various ways you can strengthen your balance sheet.

11        Q    Well, and that's an important distinction, and I

12    appreciate you bringing it to my attention.  Their

13    repayment of the $175,000 to themselves does not assume

14    that they paid all of their other creditors?

15        A    No.

16        Q    No.

17        A    I was asked what they may have realized.

18        Q    And did you, in taking into account what they

19    may have realized -- in opining on what they may have

20    realized, did you take into account their personal

21    liability on the debt of the hardware store?

22        A    That is their personal liability, the

23    $175,000.

24        Q    Yes, sir, and I mean something a little

25    different.  I mean their personal guarantees of the

0

46

1    corporate debt.

2         A    You're talking about had they not been able to

3    realize the payments through the business, would they

4    have come back to them personally?

5         Q    Yes, sir.

6         A    I didn't consider that.  I considered the

7    business alone.  I guess the easiest way to answer your

8    question is, it is possible they would have recovered

9    their $174,000 -- I mean, I'm just talking about the

10   value of this business to them -- but that recovery may

11   or may not have changed their own personal balance sheet.

12   I mean, my assignment was, did this business have value

13   to them.

14        Q    So what it didn't take into account is, if they

15   had paid themselves back their $175,000, and because they

16   paid themselves back they failed to make a payment to

17   another creditor for which they had personally

18   guaranteed, then that $175,000 that they paid themselves

19   back may very well just need to be paid to that creditor

20   on the personal guaranty?

21        A    That's right.  Anything could have happened to

22   that $175,000.  That was beyond the scope of my

23   assignment.  I'm repeating myself again, but --

24        Q    Yes, sir.

25        A    -- the best they could have done is gotten the

0

47

1   $175,000 out of the business.  I didn't opine that that

2   business was going to continue to remain for a period of

3   time and throw out any income and anything else.

4        Q    Did you review -- and it's in this stack of

5   documents, Dr. Cook -- did you review the personal

6   guaranties of the Newtons on the Edgehill note?

7        A    No, but I had read about those in that --

8   whatever we called that document as a result of that

9   hearing.  There was a discussion of personal guaranties

10  and the controversy with regards to what was or was not

11  personally guaranteed.  I'm just not in a position to

12  offer an opinion on any of that.

13       Q    Yes, sir.  And you haven't opined and you don't

14  intend to opine on any sort of the priority of how

15  creditors should be paid while the Newtons are paying

16  themselves back $175,000?

17       A    It's beyond the scope of what I was asked to do.

18  I'm not going to opine on any of that.

19       Q    Looking with me, if you will, at your report,

20  Dr. Cook -- and I'm going to use the one that was -- yes,

21  sir, the one that was produced to me.  And I'm going to

22  start at the beginning at the introduction.  In looking

23  at the second sentence in your introductory paragraph, it

24  says, The facts were produced by plaintiff's counsel or

25  are the result of research I conducted.  And I just want

☐

79

1      Q     In your opinion, is that because Edgehill Ace

2    Hardware was undercapitalized?

3      A     They were undercapitalized.  Their debt -- just

4    think about it.  They had to pay off $515,000 in debt and

5    $400,000 in interest during that period.  Had they been

6    able to put all of that money in themselves, they would

7    not have had that burden.  I mean, that's the burden

8    we're talking about them being relieved from.  That's

9    huge.  Without that relief, they had a huge debt

10   burden.

11     Q     Without that relief, and what --

12     A     The relief from the Act, yes.  As I stated in

13   the beginning, that's what's going on here.  They needed

14   that relief.

15     Q     And that huge debt burden occurred because of

16   the undercapitalization?

17     A     Well, they started out with

18   800-and-some-thousand dollars in debt.  That's a huge

19   debt burden.  They reduced that all the way down to --

20   what was it, $300,000?  But they still owed that bank,

21   Bank of McKenney, a large amount of money, in addition to

22   what they owed themselves.  During this whole period,

23   that was a difficulty they had to address.

24     Q     So the fact that the business required

25   additional loans from the Newtons in order to pay down

Page 79

{}

80

1   that debt doesn't change your opinion that the entity was

2   able to pay its obligations when they became due?

3        A    They were able to pay their obligations when

4   they came due to everyone other than themselves.

5        Q    Because of the additional loan payments made by

6   the Newtons?

7        A    No.  Remember, that was only $160,000.  I mean,

8   you're forgetting they paid a huge amount of money over

9   and above that.  They retired $500,000 in debt and paid

10  about $400,000 in interest, and they did all of that and

11  only put $160,000 in the business.

12       Q    Well, I think you understand my confusion.  If a

13  company is solvent, is able to pay its obligations when

14  they become due, I have a hard time understanding why it

15  would need additional loans from shareholders.

16       A    Oh, I understand.  No, I understand your

17  question.  You're thinking that if you could pay your

18  obligations, why would you need to borrow money.  Every

19  company does that.  Every company borrows money and the

20  same time retires their obligations.

21            And I'll give you an example, just a small

22  company.  You take in $1,000 every month, all right, but

23  some of your receipts are quarterly.  So at the end of

24  the first quarter you take in $10,000.  You've got bills

25  of $2,000 a month.  You go out and get a short-term loan.

0

81

1    So you got a loan.  Of course, you're not taking in

2    enough money to pay your obligations.  Then the quarter

3    ends.  You pay off the loan.  January, February -- April,

4    May comes, you go out and get another loan.  So, sure,

5    there are lots of -- a lot of times you do get loans even

6    while you're paying your obligations.  That's not an

7    indication you can't pay your obligation.

8        Q    Yes, sir, but the difference between your

9    hypothetical and this situation is the Newtons didn't pay

10   themselves back.

11       A    No, they did not.  They had to get the loan from

12   themselves -- well, they paid some back.

13       Q    Yes, sir.

14       A    You know, it went up to $204,000, it went down

15   to 160-, back up to 174-.  They did not completely pay

16   themselves back, no.  No, they did not.

17       Q    And I want to make sure that I understand the

18   discussion that we were having earlier about the balance

19   sheet, and we were talking about the selling of

20   collateral in order to pay down debt and I think you

21   testified that that would strengthen a balance sheet if

22   you were selling personal collateral to pay down a

23   business debt.  But my question to you is, in the

24   situation where business collateral is being sold to pay

25   down debt so you're selling an asset to lower a