IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

BURL I. NEWTON and
SHARON C. NEWTON,
Plaintiffs,

v.                                                          Civil Case No. 3:11cv493-JAG

BANK OF MCKENNEY and
WILLIAM D. ALLEN, III,
Defendants.

## MEMORANDUM OPINION

This case is before the Court on cross-motions for summary judgment.  In May 2005, Sharon Newton, a military reservist, received orders activating her to military service.  At the time, the plaintiffs, Burl and Sharon Newton, owned closely-held corporations that had incurred debt to open a hardware store.  Their store was ultimately a failure—the property was eventually foreclosed upon and its inventory sold at auction.  This case centers on the effect of the Servicemembers' Civil Relief Act ("SCRA" or the "Act"), 50 U.S.C. App. § 501 *et seq.*, on  a) loans that the defendant-Bank of McKenney (the "Bank") made to the plaintiffs' corporations,[1] and b) the collateral pledged to secure those corporate loans.

The activation of Mrs. Newton leads the plaintiffs to raise several claims under the SCRA.  Specifically, the Newtons claim that the SCRA provides them a haven from the sale of corporate assets to satisfy business debt.  They also allege that the Bank should have lowered the

---

[1] Notably, there are two defendants in this case.  Defendant-William D. Allen, III is the Bank's trustee and the individual who conducted the auction and foreclosures at issue.  For the purposes of this Memorandum Opinion, however, this distinction is immaterial.  Essentially, the Court will treat the Bank as representing both defendants.

annual interest rate on one of their loans to 6% when Mrs. Newton was called to active service. Finally, they insist that the Bank made an unlawful credit report about them, and sold some of their personal property when it auctioned the corporate assets. For these various alleged violations of the SCRA, the plaintiffs seek compensatory and punitive damages.

As explained herein, the Court will grant the Bank's motion for summary judgment on all claims for money damages. Since the collateral sold to satisfy the corporate debt was corporate property, the SCRA did not prevent the sale; the Act only protects property of the servicemember and her dependents. For the same reason, the Bank had no obligation to reduce the interest rate charged to the corporate entities. Moreover, while the Bank may have had an obligation to reduce the interest charged to the Newtons individually as guarantors of the loan, the Newtons still have suffered no injury because of excessive interest: the Bank forgave all interest in excess of 6% before the Newtons made any payments. The plaintiffs have not responded to the Bank's motion for summary judgment as to the allegedly unlawful credit report; therefore, judgment in the Bank's favor is appropriate. With respect to the claim that the Bank sold some of the Newtons' personal property while auctioning off the corporate assets, the plaintiffs have produced no evidence that their personal property was sold. That cause of action will be dismissed as well.

Both the Newtons and the Bank also seek equitable relief under the SCRA.[2] The Court denies the motions for summary judgment by both parties as to the equitable claims, with one exception. In Count VII, the Newtons seek a permanent injunction against any efforts to collect on their guarantee of the loans at issue. (Compl. ¶ 45.) As the SCRA does not allow the Court to

---

[2] The plaintiffs seek equitable relief in the first and sixth "Causes of Action" of their amended complaint filed December 13, 2011 (the "Complaint"). The Court will hereinafter refer to the plaintiffs' seven causes of action as Counts I-VII. The defendants seek a declaratory judgment in Count I of their counterclaim (the "Counterclaim").

completely forgive debt, summary judgment dismissing Count VII is proper. The remaining equitable claims involve material, disputed issues of fact and law, and require the parties to produce additional evidence and legal analysis. The motions for summary judgment as to those claims are, therefore, denied.

## I. Legal Standard

Under Rule 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In deciding the motion, the Court must view the record as a whole and in the light most favorable to the nonmovant. *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 763 F.2d 604, 610 (4th Cir. 1985).

When confronted with cross-motions for summary judgment, "the standards upon which the court evaluates the motions for summary judgment do not change." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991); *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, No. 4:08cv124, 2012 U.S. Dist. LEXIS 32262, at *5-7 (E.D. Va. Mar. 12, 2012). "[T]he Court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). The mere fact that both sides have moved for summary judgment does not establish that no genuine dispute of material fact exists, thus requiring that judgment be granted to one side or the other. *See Worldwide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 244 (4th Cir. 1992); *Am. Fid. &*

*Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965). Even if the basic facts are not in dispute, the parties may nevertheless disagree as to the inferences that reasonably may be drawn from them, in which case summary judgment may be inappropriate, necessitating the denial of both motions. *See Am. Fid. & Cas. Co.*, 354 F.2d at 216.

Nevertheless, summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat an otherwise properly supported motion, the nonmoving party "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, the mere existence of a scintilla of evidence, or the appearance of some metaphysical doubt concerning a material fact." *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (internal quotation marks and citations omitted). The Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

## II. Facts

The following facts are not in dispute. In 1998, the Newtons decided to open the Edgehill Ace Hardware store (the "Store") in Dinwiddie County, Virginia. They turned to the Bank for financing.

In connection with the business, the plaintiffs formed two separate corporate entities. First, they formed B&S Commercial Properties, LC ("B&S"), which purchased the building for the Store. Second, they created Edgehill Ace Hardware, Inc. ("Edgehill"), to actually operate the Store. Edgehill rented the building from B&S. The Newtons are the sole members of B&S and the sole owners of Edgehill.

4

Both corporate entities borrowed money from the Bank to finance their operations. B&S borrowed $360,000.00[3] to purchase the building, (Defs. Summ. Judg. Memo., Ex. D (the "B&S Note")), and Edgehill borrowed $700,000.00 for inventory, equipment, and operating funds for the store. (*Id.*, Ex. H (the "Edgehill Note").) The Newtons personally guaranteed payment of both notes by signing separate, guaranty agreements. In addition, the Bank received collateral for the loans. To secure the Edgehill Note, the Bank took a security interest in the "inventory, chattel paper, accounts, general intangibles, and fixtures" of the store. (*See* Pls. Summ. Judg. Memo., Ex. 7.) Moreover, the Bank received a second deed of trust covering the store building, the Newton's home and some agricultural property owned by Mr. Newton. (*Id.*, Ex. 8.) To secure the B&S Note, the parties executed a deed of trust covering the store building. (*Id.*, Ex. 3.)

The hardware business failed miserably. In eight years of operation, 1998 to 2006, it showed a profit in only one year. Both B&S and Edgehill were often late on loan payments or skipped them entirely. In an attempt to nurse the business along, the Bank modified the Edgehill Note several times. (Defs. Summ. Judg. Memo. ¶¶ 13-14.) In 2004, the Bank changed the note to require interest payments only for six months. In 2005, the Bank again modified the note to require only interest payments. Despite these changes, the corporations chronically made late payments, and eventually stopped paying at all. The last payment on either the B&S or the Edgehill Note occurred in November 2005. On January 16, 2006, the Newtons notified the Bank that they intended to close the store, which they did in April of that year.

In the midst of the Store's failure, the United States Navy mobilized Sharon Newton to active duty in the military. On June 15, 2005, two days after her call-up, she requested the Bank

---

[3] This loan was later modified at a principal amount of $330,848.07.

to reduce the annual interest rate on her loans to 6%, pursuant to the SCRA. *See* 50 U.S.C. App. § 527(a)(1).   She also provided the requisite documentation under the Act.   The Bank immediately lowered the rate on all indebtedness of the Newtons, and on the B&S Note, to 6%. Because the Small Business Administration ("SBA") guaranteed the Edgehill Note, the Bank requested the SBA's permission to lower its interest rate.   The SBA waffled on the issue, first telling the Bank to get the approval of the loan servicing company, then approving the new rate, and later disapproving it.   In 2007, the Bank reduced the Edgehill Note's interest rate to 6% beginning in May of that year.[4]   It later raised the rate back to the original contract figure.   In 2010, the Bank decided to lower the interest rate to 6% for the entire time Mrs. Newton on active duty.   As a practical matter, this made no difference to the Newtons—they had failed to make a loan payment for five years, since November 2005.   Still, the Bank calculated the interest charged in excess of 6%, and credited that amount to the Edgehill Note, reducing the indebtedness by a relatively small amount.

On April 25, 2007, the Bank foreclosed on the Store pursuant to the B&S Note and deed of trust.[5]   The foreclosure sale generated enough money to pay off the B&S Note entirely, and to reduce the balance on the Edgehill Note.

---

[4] The Bank apparently chose May 24, 2007, because that is the day after it auctioned off the Store's assets, as discussed below.  The Bank must have believed that on that date, the Newtons became liable as guarantors, and that the Bank could not assess a higher interest rate because of the SCRA provision limiting interest to 6% for active members of the military.

[5] In July 2006, B&S filed for bankruptcy in order to forestall the foreclosure.  The parties eventually agreed to a consent order in the bankruptcy case, allowing the foreclosure to go forward.  The consent order waived any rights B&S had under the SCRA, but preserved any SCRA claims of the Newtons.  The Newtons, as individuals, were not parties to the bankruptcy proceeding.

On May 23, 2007, the Bank auctioned the inventory, fixtures, and equipment of the Store, pursuant to the Edgehill Note and financing agreement. The sale did not generate enough funds to pay off the Edgehill Note, which has a current balance of over $300,000.00.

Before the sale of the Edgehill assets, the Bank allowed the Newtons to retrieve any personal items from the Store. Mr. Newton met with Bank officers, retrieved his personal property, and signed an inventory. Although at the time he did not mention it, Mr. Newton now says that the Bank auctioned off his personal mower deck. Yet, the auctioneer's inventory of items sold does not contain the mower deck.

Thereafter, in 2007, the Bank began to send monthly letters to Edgehill and the Newtons demanding payment of the outstanding balance on the Edgehill Note.

Before the sales of the B&S and Edgehill assets, the Bank did not petition any court for permission to do so. In its Counterclaim, the Bank now asks permission to foreclose on the Newton's home and certain farm properties titled to Mr. Newton, both of which were pledged as security for the Edgehill Note.

### III. Discussion

#### A. Introduction

The SCRA protects members of our military forces from various civil claims and debt-collection activities while on active duty. The Act has become particularly important as our nation has increasingly relied on reservists to carry out military jobs that members of a standing army formerly would have handled. The armed forces often pluck reservists out of civilian life for indeterminate lengths of service, leaving the reservists' various civil obligations unattended. The SCRA lessens the impact of reservists' absence on their civilian life and obligations.

This case involves six provisions of the SCRA dealing with the administration and collection of private debts.  Those provisions are summarized as follows:

- § 518(3) states that a servicemember's claim for SCRA protection "shall not itself (without regard to other considerations)" provide the basis for an adverse credit report on the servicemember.  50 U.S.C. App. § 518(3).

- § 527 provides that obligations incurred by the servicemember before entering military service may not bear an interest rate greater than 6% during the period of military service and, in some cases, for a year after discharge from the military.  50 U.S.C. App. § 527.

- § 533(b) allows the servicemember to request a court not only to stay lawsuits enforcing debts but also to restructure the obligation "to preserve the interests of all parties."  50 U.S.C. App. § 533(b).

- § 533(c) forbids foreclosures or forced sales of real or personal collateral of an active military member pledged before activation, unless the creditor obtains court permission to do so.  The servicemember enjoys this protection for nine (9) months after discharge. 50 U.S.C. App. § 533(c).

- § 591 allows a servicemember to petition a court for relief from collection of debts, and restructuring of indebtedness.  50 U.S.C. App. § 591.

- § 596 provides that the non-business assets of a servicemember may not be used to satisfy an obligation arising from the servicemember's business, unless the creditor obtains a court order allowing execution on non-business assets.  50 U.S.C. App. § 596.

This litigation raises questions about (a) the applicability of these provisions to corporate, as opposed to individual, debt, (b) the damages available to plaintiffs under the Act, and (c) the proper equitable remedies that a court may grant under the statute.

8

## B. Non-Judicial Sales – Count III

First, the Court finds that the Bank properly foreclosed on the real and personal assets of the corporations, for the simple reason that the corporations are not "servicemembers" under the SCRA.

Virginia law zealously guards the separateness of corporations and their members or shareholders. *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 212, (1987) ("The proposition is elementary that a corporation is a legal entity entirely separate and distinct from the shareholders or members who compose it. This immunity of stockholders is a basic provision of statutory and common law and supports a vital economic policy underlying the whole corporate concept."); *see Gowin v. Granite Depot, LLC*, 272 Va. 246, 254 (2006); *Barnett v. Kite*, 271 Va. 65, 70 (2006); *see also C.F. Trust, Inc. v. First Flight Ltd. P'Ship*, 306 F.3d 126, 134 (4th Cir. 2002) ("Virginia courts strongly adhere to the principle that a corporation is a legal entity entirely separate and distinct from the shareholders or members who compose it" (citations omitted)). Even a closely-held corporation, such as the companies in this case, is a separate legal entity from its owners. *See Gowin*, 272 Va. at 254 (2006) ("We find no difference between the two entity forms that would justify applying the protection of the rule to actions of closely held corporations . . ."). Many sound reasons support this principle, but the primary justification is a limitation of liability. Corporate owners of a company stand to lose only their investment if the corporation fails or incurs an enormous liability; creditors cannot reach the owners' personal assets. With risks lessened, investors are more likely to engage in corporate economic activity, creating opportunities and benefits for society.

The benefits of this distinction to the Newtons are apparent. Had someone fallen in the Edgehill store and incurred catastrophic harm, the injured person could not sue either of the

Newtons individually. Had a supplier sued the store on an open account, the only proper defendant in the suit would be the corporation. Of course, the corporation itself enjoys some benefits from the corporate/individual distinction. Had someone stolen corporate assets, the thief could only be sued by corporate entity, because the company, not the Newtons, owned the property.

The distinction between corporate and individual entities is consistent with the provisions of the SCRA. The SCRA only provides protection to "servicemembers;" it defines a "servicemember" as "a member of the uniformed services." 50 U.S.C. App. § 511(1). The Act also extends its protections to dependents of military members. 50 U.S.C. App. § 513; *see also* 50 U.S.C. App. § 511(4). The Act does not say, however, that closely-held corporations are servicemembers who enjoy statutory protection. Had Congress meant to embrace corporations within the ambit of the SCRA, it certainly could have done so, just as it did with dependents. *See Keene Corp. v. U.S.*, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . ., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Russello v. U.S*, 464 U.S. 16, 22 (1983))).

Importantly, § 596 of the SCRA supports the conclusion that Congress intended to distinguish between the protections offered to corporations and their owners. It provides that:

> If the trade or business of a servicemember has an obligation or liability for which the servicemember is personally liable, the assets of the service member not held in connection with the trade or business may not be available for satisfaction of the obligation or liability during the servicemember's military service.

50 U.S.C. App. § 596(a). In other words, business creditors cannot execute on the servicemember's non-business assets to satisfy business debt. A necessary corollary to this rule

is that business creditors are allowed to execute on the servicemember's business assets to satisfy business debt, even if the servicemember is personally liable for that business debt.

One could conclude that under section 596, the distinction between corporate and individual assets used in business is irrelevant, as long as the creditor only enforces the debt against business assets. Yet, the Court need not reach this conclusion. Suffice to say that corporate assets used in a business are available to satisfy corporate debt, even when the servicemember is on active duty and has personally guaranteed the obligation. The sale of the Store and Edgehill inventory and supplies was clearly a sale of business assets, as contemplated by the SCRA. Thus, it did not violate the Act.

The plaintiffs argue that courts should construe the SCRA liberally to achieve its protective purposes. *See Gordon*, 2012 U.S. Dist. LEXIS 32262, at *19-20 ("The [SCRA] is always to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation." *Boone v. Lightner*, 319 U.S. 561, 575 (1943)); *see also Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 637 F.3d 454, 458 (4th Cir. 2011). But liberal interpretation does not allow the Court to insert language that does not exist, or to ignore language that does. The plaintiffs ask the Court to rewrite the Act. The Court cannot, however, amend the definition of "servicemember" to include closely-held corporations, and cannot repeal the provision allowing business assets to be used to satisfy business debts.

Relying on *Cathey v. First Republic Bank*, the Newtons urge the Court to ignore the distinction between corporate and personal debt. No. 00-2001-M, 2001 U.S. Dist. LEXIS 13150 (W.D. La. July 6, 2001). In that case, a reservist and his wife borrowed money for their family corporation. When the servicemember was called to active duty, the plaintiffs sought protection under a predecessor of the SCRA, which the court granted. *Cathey*, however, differs from the

instant case in an important particular. The servicemember and his wife signed the note as makers, not simply guarantors. Since *Cathey* involved the maximum interest rate that could be charged to servicemembers on active duty, the rate on the note had to be lowered. *See* 50 U.S.C. App. § 527. Here, the plaintiffs are guarantors. As discussed below, they only became liable after the corporate defendant defaulted. Thus, the plaintiffs' liability is distinct from their corporations' liability. In *Cathey*, the language of § 596 and the distinction between corporate and individual liability were rendered meaningless.[6] In *Fifth Third Bank v. Schoessler's Supply Room*, LLC and *Linscott v. Vector Aerospace*, the other two cases on which the plaintiffs primarily rely, the courts simply followed the *Cathey* reasoning without meaningful discussion of the distinction between corporate and personal debt or the language of § 596. *Linscott v. Vector Aerospace*, No. CV05-682-HU, 2006 U.S. Dist. LEXIS 30023 (D. Or. May 12, 2006); *Fifth Third Bank v. Schoessler's Supply Room, LLC*, 190 Ohio App. 3d 1 (Ohio Ct. App. 2010) The Court finds those decisions unhelpful in its analysis.

In sum, the Newtons did not own the assets on which the Bank foreclosed, and cannot rely on the SCRA to protect those corporate assets. The Court, therefore, grants the defendants' motion for summary judgment on Count III, seeking damages for improper foreclosure and sale of assets.

## C. Lowered Interest Rates – Count II

Similarly, the Bank was not required to lower the interest rate charged to the corporate borrowers upon Mrs. Newton's mobilization. B&S and Edgehill are entirely separate entities from the individuals who guaranteed their loans. Section 533 of the SCRA applies to "an obligation . . . incurred by a servicemember;" for such obligations, a creditor may not charge

---

[6] Critically, *Cathey* was decided prior to the December 2003 enactment of § 596 of the SCRA.

interest in excess of 6% while the member is in active service. Again, the Act does not say that corporations owned by servicemembers may claim a reduction in the interest rates on their debt. For this reason alone, the Bank was not required to lower the interest rate applicable to the companies.

Nevertheless, other reasons independently lead to the conclusion that the Bank did not need to lower the interest rates on the B&S and Edgehill Notes. First, the Newtons, as guarantors, were not primarily obligated on the debt. Virginia law distinguishes between guarantors and makers of debt. The Supreme Court of Virginia has discussed this distinction in a case concerning whether a litigant was a surety or guarantor:

> The distinctions between a contract of guaranty and one of surety have been carefully drawn and clearly defined and are ably detailed in *Piedmont Guano & Manuf'g Co. v. Morris & Als.*, 86 Va. 941, 944, 945, 11 S.E. 883:
>
> '. . . Guaranty is distinguished from suretyship in being a secondary, while the latter is a primary obligation.
>
> 'The contract of the guarantor is his own separate undertaking, in which the principal does not join. The guarantor contracts to pay, if, by the use of due diligence, the debt cannot be made out of the principal debtor, while the surety undertakes directly for the payment, and so is responsible at once if the principal debtor makes default; or, in other words, guaranty is an undertaking that the debtor shall pay; suretyship, that the debt shall be paid . . .

*Phoenix Ins. Co. v. Lester Brothers, Inc.*, 203 Va. 802, 807 (1962). The guarantor on a note has a different liability than the maker—liability that only comes into existence when the maker defaults. As such, the Newtons only incurred liability once the corporation defaulted. The corporation's liability for interest continued at all times at the contract rate. The Bank, therefore, had no duty to lower the interest rates on the B&S and Edgehill Notes.

This conclusion may lead to a question the answer to which turns on a fine distinction: can the servicemember be liable as a guarantor for corporate debt that accrues at a rate greater than 6%? Fortunately, the facts in this case render that question moot.

Here, Mrs. Newton asked the Bank to lower her interest rate to 6% effective on her mobilization in June 2005. The Bank immediately complied and reduced the rate for all personal debt of the Newtons. As to the Edgehill Note, however, the Bank waffled. It tried to foist responsibility for this decision on the SBA, after receiving conflicting directions from its representatives. Consequently, at one time the Bank said that the contract rate remained in effect, at another it claimed that the rate would fall to 6% for the period following the sale of corporate assets, and finally it decided to reduce the rate to 6% for the entire time Mrs. Newton was on active duty. The Bank did not reach its final decision until 2010; at times between 2005 and 2010, it charged a higher contract rate on the Edgehill Note.

In 2010, the Bank recalculated the interest owed on the loan and retroactively credited the excess interest to the principal owed. The Newtons never made a payment at the higher rate while Mrs. Newton was on active service. Thus, even if the Bank wrongfully charged the contract rate, that action caused no harm to the Newtons—the Bank has forgiven all excess interest charges. *See Frazier v. HSBC Mortg. Servs.*, 401 Fed. Appx. 436, 441-42 (11th Cir. 2010). It is as if the interest were never charged.

Notwithstanding, the plaintiffs claim they are entitled to compensatory damages, presumably for the aggravation and anguish caused by the belief that they were accumulating interest at a rate higher than 6%. The plaintiffs cannot recover damages for emotional harm relating to the interest rate, which is a contractual claim. As one court has held, the SCRA effectively amends the contract between the parties: "[T]he provisions of the SSCRA provide for

14

an effective amendment of contractual provisions regarding interest rates during the period when a serviceman is in the service on active duty." *Cathey*, 2001 U.S. Dist. LEXIS 13150, at *16. The Court, therefore, may only award contractual remedies for a breach of the amended contract. A claim that the Bank charged interest greater than the rate allowed under the "federally mandated contractual amendment is pure and simple a contract claim, not a tort claim." *Id.* at *16-17.

A party may not recover damages for emotional distress from a breach of contract. *Rice v. Community Health Ass'n*, 203 F.3d 283, 288 (4th Cir. 2000) ("Courts have universally rejected claims for damages to reputation in breach of contract actions reasoning that such damages are too speculative and could not reasonably be presumed to have been contemplated by the parties when they formed the contract." (citations omitted)); *Isle of Wight County v. Nogiec*, 281 Va. 140, 148-49 (2011) ([A]bsent some tort, damages for humiliation or injury to feelings are not recoverable in an action for breach of contract. *Sea-Land Service, Inc. v. O'Neal*, 224 Va. 343, 354 (1982) (quotation marks and citations omitted)). *See also Moorehead v. State Farm Fire & Cas. Co.*, 123 F. Supp. 2d 1004, 1006-07 (W.D. Va. 2000); *Wise v. General Motors Corp.*, 588 F. Supp. 1207, 1210-12 (W.D. Va. 1984). Ordinarily the appropriate remedy would be damages in the amount of the overcharge. Here, however, the plaintiffs never paid any overcharges, and the Bank eventually reimbursed the higher interest charges in favor of the Edgehill Note. In short, the plaintiffs have suffered no damage as a result of the excess interest.

Accordingly, the Court will grant summary judgment for the defendants on Count II of the Complaint.

D. Improper Sale of Mower Deck – Count IV

In Count IV, Mr. Newton contends that the Bank improperly sold his personal mower deck at the auction of the Edgehill inventory, fixtures, and equipment, in violation of 50 U.S.C. App. § 596. During discovery, the Bank produced an inventory of items sold at auction—the mower deck does not appear on that inventory list. The plaintiff stated in his deposition that he had some additional papers to look through that might tell him about the status of the mower deck and, possibly, other property. (*See* Burl I. Newton Dep., 103:4-22, ECF No. 34, Ex. B.) To this day, he has failed to produce any documents or evidence related to the mower deck. The plaintiffs' evidence, at this stage, essentially shows that Mr. Newton does not know what the auctioneer sold; he only knows that he does not have his mower deck.

The defendant has produced evidence that the deck was not sold at the auction. As such, the burden shifts to the plaintiff to produce evidence to refute that position. *See Burgoon v. Potter*, 369 F. Supp. 2d 789, 799 (E.D. Va. 2005) (Compelling summary judgment against a plaintiff who failed to present evidence rebutting the defendant's motion, thereby failing to show any remaining issues of material fact); *Harik v. National Aeronautics and Space Admin.*, No. 4:06CV56, 2006 WL 2381964, at *14 (E.D. Va. 2006) (Finding summary judgment against a plaintiff who failed to present any evidence of a genuine issue of material fact). *See also Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (Noting the trial court's affirmative duty to prevent "factually unsupported claims and defenses" from reaching trial) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986))). The plaintiffs have produced no such evidence. The Court, therefore, will grant summary judgment to the defendants on Count IV.

E.   Improper Credit Report – Count V

The Bank has moved for summary judgment on Count V, alleging improper disclosure of information to credit agencies in violation of 50 U.S.C. App § 518. Section 518 forbids creditors

16

from giving poor credit reports after the debtor-servicemember has sought the "stay, postponement, or suspension" of payment under the SCRA, "without regard to other considerations." 50 U.S.C. App. § 518. The Bank argues that the Newtons never sought a "stay, postponement, or suspension," and therefore, have not triggered the protections of § 518. Additionally, the Bank states that it has not reported the sale of B&S and Edgehill property; rather, it simply reported that it had received no payments on the Edgehill Note since 2005. Apparently, the Bank contends that failure to pay for seven years is an "other consideration" that justifies a report.

The plaintiffs have not responded to this argument. Accordingly, the Court will grant summary judgment for the Bank on Count V.

F. Equitable Relief – Counts I, VI, VII and the Defendants' Counterclaim

Both parties have moved for equitable relief. In Count I, the plaintiffs request that the Court stay foreclosure proceedings; apparently their request deals with their home and farm property. In Count VI, the Newtons request a reduction in the future interest rate on the Edgehill Note to 6% for a period equal to the time Mrs. Newton served in the military, seven years. Pursuant to § 591, the Newtons also ask the Court to restructure the debt in other, unspecified ways. In Count VII, the plaintiffs request the Court enjoin any efforts to collect on the Edgehill Note forever—in essence, forgiveness of the entire debt. In Count I of the Counterclaim, the Bank seeks permission to foreclose on the Newtons' home and farm property.

As previously discussed, nothing in the SCRA remotely implies that the Court should preclude any collection effort forever, effectively forgiving the Newtons' debt. The Court, therefore, will grant the Bank's motion for summary judgment on Count VII.

17

As to the other claims for equitable relief, the record presents factual and legal disputes the Court cannot resolve at this juncture. These issues include whether to allow foreclosure on the non-business real estate as well as whether and how to restructure the loan, if at all. The SCRA offers little guidance as to what evidence supports equitable relief and what legal standard governs the granting of such relief. The motions for summary judgment related to Counts I, VI, and the Counterclaim will, therefore, be denied. Such issues will be heard by the Court on the date originally set for trial.

## IV. Conclusion

The Court grants the Bank's motion for summary judgment as to Counts II, III, IV, V, and VII of the Complaint. The Court denies the parties' motions for summary judgment as to Counts I and VI of the Complaint, and Count I of the Counterclaim.

An appropriate order shall issue

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

/s/
John A. Gibney, Jr.
United States District Judge

Date: May 16, 2012
Richmond, VA